No. 102,891

STATE OF KANSAS, *Appellee*, v. STEVEN S. NOVOTNY, *Appellant*.

(307 P.3d 1278)

Opinion filed September 13, 2013.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, argued the cause, and *Theresa L. Barr*, of the same office, was on the brief for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: Steven S. Novotny directly appeals his jury convictions of first-degree felony murder and aggravated battery. Novotny argues the district court erred in (1) denying his motion to suppress evidence seized during a search of his house; (2) denying his motion to suppress one victim's identification of him as the shooter; and (3) improperly instructing the jury on aiding and abetting. Novotny further argues the prosecutor committed reversible misconduct during closing arguments and the cumulative effect of trial errors deprived him of a fair trial. Finally, he argues the district court violated his constitutional rights at sentencing. We affirm Novotny's convictions and sentences.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 25, 2007, as Xavier Worley and Desmond Adams stood on the front porch of Worley's apartment, two men came around the corner of the building and walked past Worley and Adams, only to turn around and walk back. One of the two men said, "What's up." After Worley replied, "What's up," one of the men opened fire, shooting Worley three times and fatally striking LaQuishia Starr, Worley's girlfriend, who was inside the apartment.

Officer Joshua Lewis of the Wichita Police Department accompanied Worley on his ambulance ride to the hospital. Worley told Lewis he did not know who shot him, but that he had seen the shooter earlier that day in the neighborhood. Worley described the shooter as a 5'9" tall light-skinned black man with cornrow braids.

Starr's sister, Trashell Gasper, arrived at the hospital sometime after Worley emerged from surgery and asked Worley who shot

him. Worley could not speak following his surgery, but he wrote the word "Loco" on a piece of paper and indicated that his cousin, Lori Worley, knew Loco. On the same piece of paper, Gasper wrote a description Worley provided of Loco through nonverbal responses to Gasper's questions about Loco's appearance—Mexican, black hair, 5'8" to 5'10" tall and skinny, with long hair and braids. Gasper gave the written information to Detective Thomas Fatkin.

The next day, Detective Thomas Fatkin visited Worley in his hospital room. Worley was still unable to speak, but he communicated with Fatkin through nonverbal gestures and in writing. Worley described the shooter to Fatkin as a 5'7" tall, "mixed-male" man, weighing approximately 175 pounds with brown and black hair. Worley indicated the shooter's name was Loco and that Worley's cousin, Lori Worley, previously dated a friend of Loco's and had a child with that friend. Finally, Worley informed Fatkin that he had seen Loco in Worley's neighborhood earlier on the day of the shooting.

Because of tips from Worley's family that Novotny shot Starr, Fatkin showed Worley a single photo of Novotny, who police knew by the alias "Loco." Fatkin asked Worley if the person in the photo was the same "Loco" who shot him. Worley wrote "not the same" on Novotny's photo. Later that day, Fatkin returned to the hospital and showed Worley six more individual photos that did not include Novotny's photo. Worley identified a man in one photo as Lesly Pruitt, the man he previously referred to as Loco's friend and Lori Worley's ex-boyfriend. But Worley informed Fatkin that none of the individuals in the photos was involved in the shooting.

A few days later, Worley regained his ability to speak and told Detective Robert Shea that one of the men involved in the shooting was light skinned and the other was dark skinned, but Worley did not know which man shot him. Shea showed Worley another photo lineup. This lineup included a photo of Desmond Adams, who earlier had told police he was with Worley during the shooting. After Worley denied recognizing anyone in the lineup, Shea informed Worley he had already spoken with Adams. Worley then

changed his story and admitted Adams was with him on the front porch immediately before the shooting.

After Shea asked Worley whether tips received by police identifying Loco as the shooter were true, Worley admitted Loco shot him. Shea then showed Worley a single photo of Novotny and asked Worley, "Is this Loco?" Worley said the photo "[It] looks like him." Shea asked, "So that's the guy that was there?" Worley replied, "Yes." Even though Worley verified that he knew the man in the photo as Loco, he refused to sign the photo identifying Novotny as the shooter, citing fears of retaliation.

At trial, Worley testified he did not initially admit to police that Novotny shot him because "they could have came back after me or something like that" and he "wasn't feeling comfortable with snitching on somebody." Worley explained that for his family's sake, he finally admitted Loco shot him. Further, Worley identified Novotny at trial as the man he knew as Loco.

Worley testified that on the night of the shooting, he and Desmond Adams were standing on Worley's porch. Worley saw two men come around the corner and walk past before turning around and walking toward the porch. The man Worley knew as Loco and a second man approached Worley and Adams, and Loco said, "What's up." After Worley replied, "What's up," Loco shot him three times. Worley testified he knew Loco because his cousin, Lori Worley, had dated Loco's friend several years ago. At trial, Worley could not recall whether he identified Loco's friend as Lesly Pruitt when he spoke with Detective Fatkin, but he did recall identifying Loco as Lori Worley's "baby daddy's friend." Worley further testified he had seen Loco at an apartment across the street on the day of the shooting. However, Worley said he could not identify the other man involved in the shooting because he wore a hooded sweatshirt.

Adams testified at trial that he saw two black males—one lighter skinned and one darker skinned—approach Worley before the shooting. Adams could not see either of the men's faces, but he identified the darker-skinned black male, who was wearing a hooded sweatshirt, as the shooter. Adams also identified Novotny

as the man he knew as Loco, but he testified that Novotny was not the light-skinned black man involved in the shooting.

Brandi Williams lived across the street from Worley. Brandi testified that several people were visiting her home on the night of the shooting, including Novotny, whom she knew as Loco, and Brandi's friend, Shannon Williams. At some point, Brandi and Shannon went to a local restaurant and, as they were leaving, Brandi saw Worley outside his apartment near some cars. When Brandi and Shannon returned several hours later there were police everywhere.

Shannon Williams testified that on the night of the shooting, Novotny, whom she knew as Loco, and several other men were sitting around a table at Brandi's home, "drinking and getting high." Shannon saw guns on the table and saw a few men holding guns, but she could not recall if Novotny was holding a gun. Shannon heard Novotny say he was upset because "his sister's house got hit up by a drive-by." According to Shannon, Novotny said "he wanted to do something about it" and "get back at" those responsible for the drive-by, but he did not specifically refer to the men across the street. Shannon also testified that "[Novotny] and a couple other people were talking about doing something," and several of the men, including Novotny, were "getting hyped up" about the situation.

Law enforcement officers eventually searched Novotny's residence pursuant to a search warrant. During the search, officers retrieved a number of items, including a 9-millimeter live cartridge. Gary Miller, a firearm and tool mark examiner, testified for the State that the two cartridge casings found at the crime scene had both been fired from the same firearm. Miller compared the two cartridge casings from the crime scene with the live cartridge found at Novotny's house and opined that all three "had at one time been chambered and extracted from the same firearm." Miller also compared three 9-millimeter bullets found at the crime scene with each other and determined the bullets were all fired from the same firearm, but Miller could not determine whether the two cartridge casings and the three bullets were all fired from the same firearm.

John Cayton, a private forensic firearm and tool mark examiner, testified for the defense. Cayton agreed that the two cartridge casings found at the crime scene were fired from the same firearm, but he could not conclude the live cartridge found at Novotny's residence had been chambered or extracted from the same gun as the two cartridge casings.

A jury found Novotny guilty of the aggravated battery of Worley and the first-degree felony murder of Starr. The court sentenced Novotny to life in prison with a mandatory minimum of 20 years on the first-degree murder conviction and a consecutive term of 48 months' imprisonment on the aggravated battery conviction. We have jurisdiction over Novotny's direct appeal under K.S.A. 22-3601(b)(1) (life sentence; off-grid crime).

## DISCUSSION

*We decline to address Novotny's challenge to the validity of the search warrant in light of Novotny's failure to challenge both grounds cited by the district court to support its suppression ruling.*

Before trial, Novotny moved to suppress evidence seized during the search of his residence, arguing the search warrant affidavit failed to establish a nexus between his alleged criminal activity and the place to be searched. The court denied Novotny's motion, finding that although the evidence supporting probable cause may not have been overwhelming, it was sufficient. Alternatively, the district court found that even if the affidavit lacked probable cause, the good-faith exception delineated in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677, *reh. denied* 468 U.S. 1250 (1984), applied, permitting the evidence to be used at trial.

On appeal, Novotny argues the search warrant affidavit was not supported by probable cause. But we decline to address this argument because Novotny challenges only the district court's probable cause determination. Novotny candidly admitted at oral argument before this court that he failed to brief any argument challenging the district court's alternative holding that even if the warrant was not supported by probable cause, the evidence seized was admissible under the *Leon* good-faith exception.

We conclude Novotny abandoned his challenge to the district court's alternative ruling on the *Leon* exception by failing to brief any argument related to that ruling. See *State v. McCaslin*, 291 Kan. 697, 709, 245 P.3d 1030 (2011) (issue not briefed or argued deemed waived and abandoned). Consequently, even if we were to reverse the district court's probable cause finding, the district court's unchallenged, alternative ruling would stand. Therefore, we decline to address Novotny's challenge to the district court's probable cause determination.

*The district court correctly admitted eyewitness identification evidence.*

Novotny also filed a pretrial motion to suppress Worley's eyewitness identification of him as the shooter, arguing the identification was the unreliable product of an unnecessarily suggestive identification procedure. After a hearing, the district court agreed the identification procedure was unnecessarily suggestive. Ultimately, however, the district court concluded Worley's identification was reliable and admissible at trial. Novotny requested and received a continuing objection at trial to any testimony relative to identification. On appeal, Novotny argues the suggestive procedure rendered the identification unreliable and the district court erred in failing to suppress Worley's eyewitness identification.

*Standard of Review*

When reviewing the factual underpinnings of a district court's decision to admit or suppress eyewitness identification evidence, we apply a substantial competent evidence standard. We review the ultimate legal decision drawn from those facts de novo. *State v. Corbett*, 281 Kan. 294, 304, 130 P.3d 1179 (2006).

*Analysis*

Our caselaw has long recognized that "eyewitness identifications can be unreliable and result in wrongful convictions." *State v. Mitchell*, 294 Kan. 469, 474, 275 P.3d 905 (2012) (citing *State v. Warren*, 230 Kan. 385, 390-92, 635 P.2d 1236 [1981]). But it is equally well established that

"[a]n identification infected by improper police influence . . . is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is 'a very substantial likelihood of irreparable misidentification,' *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Perry v. New Hampshire*, 565 U.S. ____, 132 S. Ct. 716, 720, 181 L. Ed. 2d 694 (2012).

Further, we have recognized that several procedural safeguards are built into the justice system to protect criminal defendants from wrongful convictions based on questionable eyewitness identification evidence. Those safeguards include, but are not limited to, the defendant's constitutional right to confront the witnesses against him or her; the defendant's constitutional right to effective assistance of counsel " 'who can expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments' "; eyewitness-specific jury instructions that " 'warn the jury to take care in appraising identification evidence' "; and the constitutional requirement that the State prove every element of the crime beyond a reasonable doubt. *State v. Marshall*, 294 Kan. 850, 868-69, 281 P.3d 1112 (2012) (quoting *Perry*, 132 S. Ct. at 728-29).

Here, the district court found the law enforcement officers' repeated use of a one-photo lineup to be unnecessarily suggestive. The State argues, as it did below, that the identification procedure was not unnecessarily suggestive and urges us to affirm the district court's suppression ruling as right for the wrong reason. But we decline to address this argument because the State failed to cross-appeal the district court's ruling finding the identification unnecessarily suggestive. See K.S.A. 60-2103(h) (to obtain appellate review of adverse rulings, appellee must file notice of cross-appeal); *Cooke v. Gillespie*, 285 Kan. 748, 754-55, 176 P.3d 144 (2008).

Nonetheless, we affirm the district court's suppression ruling because the record supports the district court's conclusion that the identification procedure used did not lead to a substantial likelihood of misidentification under the facts of this case. The court

specifically noted that this was not a "pure stranger" case and suggested the inconsistencies in Worley's identification of the shooter implicated Worley's credibility rather than the reliability of his identification. We agree.

The factors courts ordinarily consider in reviewing the reliability of an eyewitness identification are similar, though not identical, to the factors listed in PIK Crim. 3d 52.20, the eyewitness identification jury instruction. See *Mitchell*, 294 Kan. at 478 (discussing eight factors trial courts use to assess reliability in considering whether to suppress eyewitness identification). And, as this court has previously held, the factors set out in that instruction "contemplate an eyewitness who does not know the defendant personally. Where the witness personally knows the individual being identified, the cautionary eyewitness identification instruction is not necessary. The accuracy of the identification can be sufficiently challenged through cross-examination." *State v. Calvin*, 279 Kan. 193, Syl. ¶ 9, 105 P.3d 710 (2005).

Similarly, in *Mitchell* we stated that "the normal concerns about eyewitness reliability, as discussed in the caselaw and scientific literature, are not present" when the eyewitness is acquainted with the defendant. 294 Kan. at 482. 22A C.J.S., Criminal Law § 1101 states:

"A pretrial identification obtained from suggestive procedures may be introduced into evidence if found to be reliable and based solely upon the witness' independent recollection at the time of the crime, uninfluenced by the intervening illegal confrontation. For example, where the witnesses knew the defendant, improper identification procedures do not taint the witnesses' identification testimony."

In short, consistent with our statements in *Mitchell* and *Calvin*, if Worley knew Novotny before the shooting and before he was exposed to any unnecessarily suggestive identification procedure, the normal concerns about the reliability of his identification of Novotny as the shooter are not present.

Here, the record demonstrates that Worley knew Novotny before the shooting. Worley testified he knew Novotny as Loco and that his cousin, Lori Worley, had a relationship and a child with Loco's friend several years before the shooting. Worley also testi-

fied he had seen Loco in his neighborhood a few days before the shooting. Detective Fatkin testified that Worley also reported seeing Loco on the day of the shooting. Yet, the record also demonstrates that Worley did not immediately identify Novotny as the shooter, and, at one point, Worley noted on Novotny's photo that Novotny was "not the same" person who shot him.

Nonetheless, as noted by the district court, Worley's failure to immediately identify Novotny as the shooter and his inconsistent statements regarding the identity of the shooter called Worley's credibility into question but did not render his identification unreliable. See *Calvin*, 279 Kan. at 206 (noting distinction between reliability of eyewitness identification and credibility of eyewitness). Simply stated, the jury was appropriately situated to weigh Worley's testimony and prior inconsistent statements. See *Corbett*, 281 Kan. at 305 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S. Ct. 2243, 53 L. Ed. 2d 140 [1977]) (" 'We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.' ").

Further, there were other procedural safeguards in place to protect Novotny from a wrongful conviction based on eyewitness identification evidence. Defense counsel extensively cross-examined Worley about his familiarity with Novotny, his ability to identify Novotny as the shooter given the circumstances surrounding the shooting, and his prior inconsistent statements regarding the identity of the shooter. Additionally, the district court issued a cautionary eyewitness identification jury instruction to " 'warn the jury to take care in appraising identification evidence.' " See *Marshall*, 294 Kan. at 869 (quoting *Perry*, 132 S. Ct. at 728-29).

We conclude the district court properly admitted the eyewitness identification evidence, allowing the jury to determine the weight, if any, to give that evidence.

*The district court appropriately instructed the jury on aiding and abetting and did not err in answering a jury question.*

At trial, the district court, over Novotny's objection, provided the jury with an aiding and abetting instruction labeled as Instruction No. 10:

"A person who either before or during its commission, intentionally aids, abets, advises, hires, counsels, [or] procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

Later, during its deliberations, the jury asked: "If Mr. Novotny was involved [*sic*] counseling or planning the shooting, does instruction No. 10 apply?" In discussing how to answer the question, Novotny urged the trial court to distinguish evidence that he made nonspecific statements about revenge prior to the shooting with evidence that he was one of the two men who approached Worley. Novotny ultimately asked the court to advise the jurors that Instruction No. 10 "does not apply, unless they find that Mr. Novotny was one of the two individuals that confronted Mr. Worley." Ultimately, the court instructed the jury to reread Instruction No. 10.

On appeal, Novotny asserts that the district court erred in instructing the jury on aiding and abetting. Specifically, he argues that the evidence presented in this case impermissibly permitted the jury to find him guilty as an aider and abettor "based upon his mere association with an individual who actually committed the crime." The State argues the district court properly instructed the jury on aiding and abetting based on Shannon Williams' trial testimony and the evidence that ammunition found during the search of Novotny's house had been chambered and extracted from the same firearm as two spent cartridges found at the crime scene.

"[T]he aiding or abetting instruction is appropriate if, from the totality of the evidence, the jury could reasonably conclude that the defendant aided and abetted another in the commission of the crime." *State v. Holt*, 285 Kan. 760, 773, 175 P.3d 239 (2008); see *State v. Pennington*, 254 Kan. 757, 764, 869 P.2d 624 (1994).

" 'To be convicted as an aider and abettor, "the law requires that the person knowingly associates with the unlawful venture and participates in a way which indicates that such person is furthering the success of the venture." *State v. Hobson*, 234 Kan. 133, 138, 671 P.2d 1365 (1983). Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is itself insufficient to establish guilt as an aider and abettor; however, when a person knowingly associates with the unlawful venture and participates in a way which indicates he or she willfully is furthering the success of the venture, such evidence of guilt is sufficient to go to the jury. [Citation omitted.]' *State v. Kaiser*, 260 Kan. 235, 242, 918 P.2d 629 (1996), *disapproved on other grounds State v. Gonzalez*, 282 Kan. 73, 145 P.3d 18 (2006)." *State v. Simmons*, 282 Kan. 728, 738, 148 P.3d 525 (2006).

Focusing almost solely on one portion of Shannon Williams' testimony, Novotny points out that Shannon claimed only that she heard Novotny generally discuss getting back at someone for shooting at his sister's house. But Novotny contends the State presented no evidence that he "suggested, encouraged, or directed anyone to go to Worley's house to commit any crime." Further, Novotny contends the State presented no evidence that he "knowingly associated in an unlawful venture or participated in a way to indicate that he furthered the success of an unlawful venture."

Novotny's argument might be persuasive if we were to consider it in a vacuum rather than as part of the totality of the circumstances we are required to consider. As the State points out, Shannon Williams testified that on the night of the shooting, she saw guns on the table at Brandi Williams' home and observed several individuals holding guns. Shannon could not recall whether Novotny was holding a gun, but she did hear Novotny "talking about how he was mad, 'cause his sister's house got hit up by a drive-by." According to Shannon, Novotny said "he wanted to do something about it." Shannon further testified that "[Novotny] and a couple other people were talking about doing something" and about getting back at the person responsible for the drive-by shooting, and that several of the men, including Novotny, were "getting hyped up" about the situation. Further, Brandi testified that at some point she and Shannon went to a local restaurant and, as they were leaving, she saw Worley outside his apartment. When Brandi and Shannon returned, police were everywhere.

Contrary to Novotny's argument, Shannon's and Brandi's testimonies do more than support guilt by association. Further, the State offered other testimony supporting the aiding and abetting charge. Miller testified he compared the two cartridge casings from the crime scene with the live cartridge found in Novotny's home and concluded all three cartridges "had at one time been chambered and extracted from the same firearm."

Based on our review of the totality of the evidence in this case, we conclude the jury could reasonably have concluded Novotny aided and abetted another in the commission of the crime, and the district court did not err in instructing the jury on aiding and abetting.

Novotny also briefly contends the trial court erred as a matter of law in responding to the following jury question: "If Mr. Novotny was involved [sic] counseling or planning the shooting, does instruction No. 10 apply?" Essentially, it appears Novotny has simply restated his argument regarding the lack of evidence to support the aiding and abetting instruction.

We review a trial court's response to a jury question for an abuse of discretion. *State v. Wade*, 295 Kan. 916, 920, 287 P.3d 237 (2012).

In light of our decision that the trial court correctly instructed the jury on aiding and abetting, we further conclude the trial court did not abuse its discretion in responding to the jury's question by referring to the original instructions. See *Wade*, 295 Kan. at 923 (approving "the tack of simply directing the jury's attention back to the instructions").

*The prosecutor did not commit reversible misconduct during closing argument.*

During the State's closing argument, the following dialogue occurred:

"[Prosecutor]: The witnesses, Xavier [Worley] especially, Shannon [Williams], you know, they testified they didn't want retaliation. In fact, didn't—Shannon is the one that testified that after this happened, she went into hiding, 'cause she doesn't want to get in trouble with these guys. In fact, *she said she didn't want to be here testifying in front of the defendant.* You use that—

"[Defense counsel]: Objection. She never said that, Your Honor, and I object.

"THE COURT: The jury will decide the facts. This is argument. This is not evidence.

"Go ahead.

"[Prosecutor]: You saw what happened in the courtroom, and you judge the witnesses and the way they were on the witness stand. Did they look at the defendant when they were in the courtroom? No. They were looking over there. They didn't want to look at the defendant. Was the defendant looking at them? *And you saw him eye-balling the witnesses.*

"[Defense counsel]: Objection, Your Honor. I'd ask the jury be told to disregard that kind of statement.

"THE COURT: No. You—no . . . . That's overruled.

"Go ahead.

"[Prosecutor]: You judge what the witnesses were feeling and the weight to give their testimony and why they talked to the police the way they did, why they said what they did to the police at the time and their demeanor here in the courtroom in front of the defendant, in front of you." (Emphasis added.)

After the jury was sent to deliberate, the following discussion occurred:

"[THE COURT]: There was also an objection made in the course of Closing Argument, and I want to just say for the record, the only reason I'm saying this is because I called the attorneys up to the bench, and I didn't put this on the record, and I should have. At the time that Mr. Xavier Worley was on the stand, I called up the lawyers to the bench, and I informed [defense counsel] that Mr. Novotny was attempting to stare down Mr. Worley, and I simply asked [defense counsel] to tell his client not to do that, to stop it.

"Now, in all fairness, [defense counsel] responded that he hadn't seen any of that behavior. That's all I wanted to put on the record.

"[Defense counsel]: Well—

"[Prosecutor]: The victim did tell me about it, Judge.

"[Defense counsel]: Well, in the State's statement in Closing Argument, which I objected to, he's staring down the witnesses, plural. Again, I think that's objectionable; but two, it's the prosecutor testifying. She observed something in the courtroom.

"Now, if the jury saw it, they want to put some kind of connotation to it, but [the prosecutor] is saying she saw something, basically, and relating that to the jury, and I think that's inappropriate, as well as the nature of the statement itself."

Novotny argues the prosecutor inflamed the passions and prejudices of the jury and misstated the evidence when she advised the jury that Shannon Williams did not want to testify in front of Novotny. He argues the prosecutor's comments "were an attempt to paint a picture portraying Mr. Novotny as a vindictive and dan-

gerous person." In contrast, the State contends the prosecutor accurately characterized Shannon's testimony and did not commit misconduct.

Novotny also asserts that the prosecutor's comment in closing argument that Novotny "eye-balled" the witnesses was "tantamount to the prosecutor providing testimonial evidence." The State again disagrees, citing the district court's on-the-record recognition that it had cautioned Novotny's counsel regarding Novotny "staring down" the witness. The State further suggests the prosecutor simply commented on the defendant's demeanor, which the jury could have observed on its own.

When reviewing an allegation of prosecutorial misconduct, we first consider whether the comments were outside the wide latitude allowed the prosecutor in discussing the evidence. If so, we next determine whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Naputi*, 293 Kan. 55, 58, 260 P.3d 86 (2011); *McCaslin*, 291 Kan. at 715. In this step of the analysis, we consider three factors: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of the jurors. None of these three factors is individually controlling. *Naputi*, 293 Kan. at 58.

*The prosecutor's comment regarding Shannon's reluctance to testify was not improper.*

Novotny contends the prosecutor misstated the evidence during closing argument when she advised the jury that Shannon Williams did not want to testify in front of the defendant. "This court has repeatedly held that in closing argument, a prosecutor may draw reasonable inferences from the evidence but may not comment upon facts outside the evidence. [Citation omitted.]" *State v. Hall*, 292 Kan. 841, 848, 257 P.3d 272 (2011).

At trial, Shannon testified she did not call the police after the shooting to tell them what she had overheard that day because she "was scared that it might come back to [her] and they might do

something to [her]." Detective Shea testified Shannon "stated shortly after the shooting she kind of cut off all contact with all those people involved that she was hanging out with, and I believe she said she kind of went into hiding, tried to withdraw from everybody." When asked at trial whether she wanted to be there, Shannon replied, "No, I don't."

Given Shannon's testimony that she did not want to be present at Novotny's trial and her testimony that she was scared "they might do something to [her]," the prosecutor drew a reasonable inference from the evidence and did not state facts not in evidence when she told the jury in closing argument that Shannon "said she didn't want to be here testifying in front of the defendant."

*The record is insufficient to determine whether the prosecutor committed misconduct by commenting that Novotny had "eye-balled" the witnesses; assuming the statements were improper, we conclude they were harmless.*

Novotny also complains about the prosecutor's statement to the jury: "[Y]ou saw him eye-balling the witnesses." Novotny argues that because there is no evidence to support this statement, it was an improper expression of personal opinion or testimonial evidence from the prosecutor. The State responds that directly commenting on a defendant's in-court demeanor does not amount to prosecutorial misconduct.

A prosecutor is prohibited from arguing facts not in evidence, but generally has wide latitude to make arguments based on reasonable inferences from the evidence presented at trial. *State v. Peppers*, 294 Kan. 377, 394, 276 P.3d 148 (2012). Nevertheless, the record is not sufficiently developed to permit us to address whether the prosecutor's comments were within the wide latitude allowed a prosecutor in discussing the evidence. While the district court did call counsel to the bench and advise defense counsel that Novotny was staring down Worley and instructed defense counsel to direct Novotny to discontinue this action, we cannot discern from the record whether the jury observed Novotny's actions. Further, the jury was not privy to the bench conference.

But even if we assume that the prosecutor's comment that Novotny "eye-balled" the witnesses was outside the wide latitude allowed a prosecutor in discussing the evidence, any potential error was harmless. See *State v. Bridges*, 297 Kan. 989, 306 P.3d 244 (2013) (discussing harmless error in context of prosecutorial misconduct claim). The prosecutor's comment did not rise to the level of being gross or flagrant, especially given the unclear state of the law on this issue. See generally Levenson, *Courtroom Demeanor: The Theater of the Courtroom*, 92 Minn. L. Rev. 573, 598-614 (2008) (discussing split among courts on how to consider nontestifying defendant's courtroom demeanor). We also cannot characterize the prosecutor's comment as gross or flagrant in light of the trial judge's purposeful creation of a record confirming what he had personally seen in the courtroom, his discussion with the prosecutor and defense counsel about Novotny's courtroom actions, and his stated reason for denying Novotny's objection during closing argument. The bottom line is that we do not know whether the jury saw what the judge saw. Under the unique circumstances of this case, we cannot find the prosecutor's comment to be gross or flagrant.

Nor do we find evidence of ill will on the part of the prosecutor. Immediately after the objected-to statement, the prosecutor reminded the jurors it was their responsibility to judge the witnesses, including "the weight to give their testimony and why they talked to the police the way they did, why they said what they did to the police at the time and their demeanor here in the courtroom in front of the defendant, in front of you." Further, the prosecutor made the statement only once during closing arguments.

Finally, the evidence in this case, while not overwhelming, was substantial. Worley identified Novotny as the shooter. Shannon Williams and Brandi Williams testified Novotny had been at Brandi's house across the street from Worley's house on the day of the shooting. Shannon saw guns on the table and heard Novotny say he was angry that his sister's house had been shot at during a drive-by shooting and he wanted to do something about it. Further, the State presented testimony that the live cartridge found during the search of Novotny's residence had been chambered and ex-

tracted from the same firearm from which were fired the cartridge casings found at the scene of the shooting.

We conclude that even if the prosecutor's statement constituted misconduct, the State has demonstrated beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record. See *Bridges*, 297 Kan. at 1017 (stating constitutional harmless error standard).

*Cumulative errors did not deprive Novotny of his right to a fair trial.*

Novotny argues that even if we find the above errors to be harmless when viewed individually, his convictions should be reversed because the cumulative effect of the errors substantially prejudiced him and deprived him of his right to receive a fair trial.

"Cumulative error will not be found when the record fails to support the errors raised on appeal by the defendant. [Citations omitted.] One error is insufficient to support reversal under the cumulative effect rule. [Citation omitted.]" *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009). Because we have found only one potential error, an assumed error regarding prosecutorial misconduct, we reject Novotny's cumulative error claim.

*The State is not required to prove Novotny's criminal history score to a jury beyond a reasonable doubt.*

Finally, Novotny argues the sentencing court's use of his prior convictions to enhance his sentence without proof to a jury beyond a reasonable doubt violated his Sixth and Fourteenth Amendment rights under the United States Constitution as interpreted by *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). We reject Novotny's claim in light of our previous decisions. See *State v. Fewell*, 286 Kan. 370, 394-96, 184 P.3d 903 (2008) (reaffirming *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 [2002]).

Affirmed.