NOT DESIGNATED FOR PUBLICATION

No. 114,396

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROBERT L. CAMPBELL, JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed November 10, 2016. Affirmed.

*Roger L. Falk*, of Law Office of Roger L. Falk, P.A., of Wichita, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., MCANANY and STANDRIDGE, JJ.

*Per Curiam*: Robert L. Campbell, Jr., appeals from his bench trial conviction of stalking in violation of K.S.A. 2011 Supp. 21-5427(a)(1), (b)(1)(A). Campbell also appeals from the trial court's order that he register under the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 *et seq*. as amended in 2011. Campbell argues that the trial court lacked sufficient evidence to convict him under K.S.A. 2011 Supp. 21-5427(a)(1), (b)(1)(A). Campbell further argues that the trial court erred when it interpreted K.S.A. 2011 Supp. 22-4902(a)(5) and (c)(15) of KORA as providing the trial

1

judge with discretion to require registration. Finding no merit in Campbell's arguments, we affirm.

T.D. owned and worked at a hair salon in Wichita, Kansas. On November 14, 2011, T.D. noticed a man, whom she later identified as Campbell, hanging around her salon entrance. She locked the salon door until her next client showed up. T.D. saw Campbell knock on the salon window. He was holding up a cell phone and pointing at the salon's phone. Although T.D. could not hear Campbell's voice through the window, she could read his lips. T.D. believed Campbell asked, "Can I use your phone?" T.D. motioned to Campbell through the window that he could not use her phone.

Approximately 30 minutes later, T.D. received a phone call at the salon. The caller's number was listed as "Private Caller." T.D. answered the call and heard a man's voice on the other end. T.D. did not recognize the voice. T.D. heard the caller say "vulgar stuff," so she hung up the phone. T.D. could not recall the specific language used during that phone call. November 14, 2011, was the first time that T.D. had received private calls of a sexual nature at her salon. The events of that day made T.D. uncomfortable and scared. When T.D. left the salon that evening, she walked out with a customer. Walking out with a customer was not a normal practice for T.D. She did not report this incident to the police.

On December 1, 2011, T.D. received a second phone call listed as "Private Caller"at her salon. T.D. noticed that the caller's voice was similar to the voice she had heard previously, which referenced vulgar language. The caller asked T.D. how late she worked. When T.D. asked the caller if he would like to make an appointment, the caller responded, "No, I just want to know how late you work so I can sit outside your window and jack off." T.D. hung up the phone. T.D. stated that the phone call made her uncomfortable and scared, so she locked the salon door. Immediately after T.D. hung up,

2

the phone rang again. T.D. answered the phone. The caller said, "Don't you want to listen to me tell you how I watch your sweet ass through the window?"

On December 6, 2011, T.D. received another "Private Caller" phone call. T.D. recognized the caller's voice as the same voice from the previous calls. The caller asked T.D., "Are you wearing something that shows camel toe?" "Camel toe" is a slang term used to describe the shape of a woman's vagina through clothing. During that call, T.D. asked the caller why he was calling her. The caller replied, "'Cause I enjoy it." After this call, T.D. reported the calls to the police. She was scared that someone was watching her.

On January 30, 2012, T.D. received two more phone calls. Both calls listed the caller as "Private Caller." T.D. made an attempt to record the first call, but the caller never spoke. T.D. received another call from the private caller minutes after the first call. The caller did not say anything on the second call either. After she hung up the phone, T.D. looked out the salon window and saw a man, whom she would later identify as Campbell, sitting on a landscape rock.

Surveillance video from the night of January 30, 2012, showed a man, whom T.D. later identified at trial as Campbell, walking in front of her salon around the time the phone calls were made. The video showed the man walking toward the salon, looking into the salon windows, and holding a phone to his ear.

T.D. made a police report the day after the January 30, 2012, phone calls were made. T.D. then met with a detective from the sex crimes bureau of the police department. The detective made a photo array based on information he received from a beat officer who worked the area surrounding the salon. T.D. was shown the photo array. She circled and initialed the photo of Campbell and signed the document, indicating Campbell was the man she had seen outside her salon. The detective identified Campbell at trial as the man whose picture T.D. had circled.

On February 6, 2012, T.D. received another "Private Caller" phone call. Once again, T.D. recognized the voice of the caller as the same voice from the previous calls. The caller said, "Please, please, let me come all over your face." Upon hearing the caller use the word "come," T.D., who was aware that the term "come" is often used as slang for ejaculate, called the police. The police escorted T.D. to her car that night. T.D. assumed Campbell was watching her because the phone calls would come when she was alone.

On February 12, 2012, Campbell was arrested in an unrelated case. During that arrest, police uncovered two cell phones in Campbell's possession. The actual owner of the phones was not determined. Only one of the phones contained anything of evidentiary value. The police obtained a warrant to search the phone. The phone contained graphic photographs, including seven pictures of women with "camel toe" and other pictures of women with semen on their faces. None of the dates associated with the pictures in the phone corresponded with the reported dates of the phone calls. The phone also contained contacts listed under other explicit names.

The search further showed outgoing calls from the phone made to a contact listed as "Fabulous" on February 11, 2012, and February 12, 2012. The phone number associated with the "Fabulous" contact was *67-262-XXXX, which is the phone number for the salon where T.D. worked. The prefix *67 is a way to block one's phone number from being displayed on caller identification.

Campbell was convicted at a bench trial of stalking in violation of K.S.A. 2011 Supp. 21-5427(a)(1), (b)(1)(A) and sentenced to 12 months' imprisonment. The State requested that Campbell be required to register under KORA. More specifically, the State requested registration under K.S.A. 2011 Supp. 22-4902(a)(5) and (c)(15). The trial court imposed the 12-month sentence and reserved the issue of registration for later consideration.

At a later motion hearing, Campbell moved for judgment of acquittal or in the alternative a new trial. Both motions were denied. The judge proceeded to hear and rule on the State's request for registration. The judge ruled in the State's favor and required Campbell to register for a period of 15 years. In doing so, the judge interpreted K.S.A. 2011 Supp. 22-4902(a)(5) as granting discretion to trial judges in determining who must register. The trial judge also stated that he was making an alternative finding that Campbell's crime was sexually motivated under K.S.A. 2011 Supp. 22-4902(c)(15). In support of this finding, the trial judge relied on the following facts:

1. Campbell had telephone contact with T.D. at least seven times over a period of approximately 3 months.
2. Campbell made personal contact with T.D. at her salon in connection with at least two of the phone calls.
3. Campbell's actions scared T.D. and caused her to change her course of business.
4. The content of Campbell's phone calls was lewd and intimidating, including Campbell asking T.D. how late she worked so that he could masturbate outside of the salon window; Campbell asking if T.D. was wearing something that showed "camel toe;" Campbell watching T.D.'s "sweet ass" through the salon window; and Campbell asking T.D. if he could ejaculate on her face.
5. T.D. identified Campbell as the person in the surveillance video outside her salon and as the person she observed outside her salon on two different dates that corresponded with offensive phone calls she received.
6. When T.D. asked Campbell why he was calling her, he stated, "'Cause I enjoy it."
7. Campbell possessed a cell phone when he was arrested that contained T.D.'s phone number in it.

5

8. The cell phone had graphic images of women with "camel toe" as well as graphic images of women with semen on their faces. These images corresponded with the content of Campbell's phone calls to T.D..

9. Campbell's sexual incentive and motivation was demonstrated by the content of the phone calls and the graphic images on the cell phone in his possession.

*Did the Trial Court Err in Requiring Campbell to Register Under KORA?*

On appeal, Campbell argues that the trial judge misinterpreted KORA in determining that he had the authority to order Campbell to register. Campbell specifically argues that because he was denied probation and was not eligible for diversion, the trial court did not have the discretion to order him to register under K.S.A. 2011 Supp. 22-4902(a)(5). On the other hand, the State argues that even if the trial judge did not have authority solely under K.S.A. 2011 Supp. 22-4902(a)(5), he did have authority to require registration after finding Campbell's crime was sexually motivated under K.S.A. 2011 Supp. 22-4902(c)(15). Campbell also argues that the rule of lenity requires this court to construe KORA in his favor and interpret the relevant provisions as not providing the trial judge with the authority to order registration.

Interpretation of a statute is a question of law over which this court has unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015). The rule of lenity states that generally criminal statutes are strictly construed in favor of the accused. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016). The rule of lenity arises only if there is any reasonable doubt of the statute's meaning. *State v. Williams*, 303 Kan. 750, 760, 368 P.3d 1065 (2016). When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind the clear language. *Barlow*, 303 Kan. at 813. Further, courts must construe statutes to avoid absurd results and presume

the legislature does not intend to enact meaningless legislation. *State v. Frierson*, 298 Kan. 1005, 1013, 319 P.3d 515 (2014).

Here, Campbell claims that K.S.A. 2011 Supp. 22-4902(a)(5) and (c)(15) of KORA are subject to the rule of lenity, but he fails to point out any ambiguities in those provisions. Instead, as discussed later, Campbell cites authorities that tend to clear up any confusion as to the meanings of the provisions in question.

Moreover, a point that is raised incidentally in a brief and not argued therein is deemed abandoned. *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015). Stating that the rule of lenity applies is not enough to require its application. The provisions in question are not ambiguous. This means that the rule of lenity does not require discussion at great length.

Campbell relies on *State v. Harkins*, No. 108,614, 2015 WL 5458665 (Kan. App. 2015) (unpublished opinion), in asserting that K.S.A. 2011 Supp. 22-4902(a)(5) does not grant a trial judge the authority to require registration absent a probation order or diversion agreement. *Harkins* involved a woman who pled guilty to aggravated battery and child abuse, offenses that are not specifically included in KORA as registerable offenses. The plea agreement included a provision that allowed the State to recommend that the court order registration under KORA. The plea agreement was rejected by the trial court, but the trial court still ordered Harkins to register under KORA's "catch-all" provision in K.S.A. 2011 Supp. 22-4902(a)(5). K.S.A. 2011 Supp. 22-4902(a)(5) defines an offender as "any person required by court order to register for an offense not otherwise required as provided in [KORA]."

The court in *Harkins* noted that the only other provision in KORA that references 22-4902(a)(5) is K.S.A. 2012 Supp. 22-4906(i), which states:

"Notwithstanding any other provision of law, if a diversionary agreement or probation order, either adult or juvenile, or a juvenile offender sentencing order, requires registration under the Kansas offender registration act for an offense that would not otherwise require registration as provided in subsection (a)(5) of K.S.A. 22-4902, and amendments thereto, then all provisions of the Kansas offender registration act shall apply, except that the duration of registration shall be controlled by such diversionary agreement, probation order or juvenile offender sentencing order."

The court in Harkins found that "[t]his provision applies only when the court has ordered registration as part of a diversion agreement, probation order, or juvenile offender sentencing. Harkins was denied probation, so this provision did not apply. Thus, the district court was without authority to order registration . . . ." *Harkins*, 2015 WL 5458665, at *2.

Campbell argues that this holding means that the trial judge in his case did not have the authority to order registration where Campbell was not subject to probation or diversion. Campbell further argues that his position is supported by the holding of our Supreme Court in *State v. Coman*, 294 Kan. 84, 283 P.3d 701 (2012). In *Coman*, the defendant was convicted of misdemeanor sodomy. The defendant was required to register under KORA after a finding that his crime was sexually motivated. *Coman*, 294 Kan. at 85. The crime the defendant was convicted of was expressly listed in KORA under a separate provision. Our Supreme Court found it illogical that the legislature would specifically list the defendant's crime in a separate provision of KORA if the crime could be brought in as sexually motivated. Thus, our Supreme Court held that the defendant's particular crime, having been expressly listed in another provision, was excluded from being a registerable offense under the sexually motivated provision of KORA. *Coman*, 294 Kan. at 97. Allowing registration under the sexually motivated provision would have worked against the intent of the legislature. *Coman*, 294 Kan. at 95.

8

Campbell correctly asserts that his order to register was not made in connection with a diversion agreement or probation order. Campbell is also correct that the crime of stalking is not found in any provision of KORA. Campbell is not correct, however, in asserting that these facts preempted the trial court from ordering him to register at all.

Campbell is similar to *Harkins* in that he was convicted of a crime that is not specifically included in KORA. This fact also distinguishes Campbell from *Coman*. Coman was ultimately not required to register under the sexually motivated provision of KORA because his crime was expressly included in another provision. What sets Campbell's case apart from *Harkins* is that Campbell is being required to register under KORA because his crime, though not listed in the Act, was found to have been sexually motivated under K.S.A. 2011 Supp. 22-4902(c)(15).

K.S.A. 2011 Supp. 22-4902(a)(1) states that "[o]ffender means: (1) A sex offender, as defined in subsection (b)." Subsection (b) of K.S.A. 2011 Supp. 22-4902 defines a "sex offender" as "any person who: (1) On or after April 14, 1994, is convicted of any sexually violent crime set forth in subsection (c)." Subsection (c)(15) of K.S.A. 2011 Supp. 22-4902 includes as a sexually violent crime:

> "any act which at the time of sentencing for the offense has been determined beyond a reasonable doubt to have been sexually motivated, unless the court, on the record, finds that the act involved non-forcible sexual conduct, the victim was at least 14 years of age and the offender was not more than four years older than the victim. As used in this paragraph, 'sexually motivated' means that one of the purposes for which the defendant committed the crime was for the purpose of the defendant's sexual gratification."

The sexually motivated provision in K.S.A. 2011 Supp. 22-4902(c)(15) (now K.S.A. 2015 Supp. 22-4902[c][17]) remains a useful and viable option for unlisted nonsex crimes. *Coman*, 294 Kan. at 94.

9

At the motion hearing where the registration issue was argued, the trial judge stated:

"I am finding that the facts in this case that support Mr. Campbell's conviction justify registration under the Act . . .

"I will also address the issue of . . . this being sexually motivated under K.S.A. 22-4902(c)(15) . . . . My ruling in regard to whether this was sexually motivated or not, which would be . . . an alternative finding under a different subsection has only to do with the Kansas Offender Registration Act and whether Mr. Campbell is required to register based upon that finding."

In the order granting the State's motion to require Campbell to register, the trial judge stated:

"The sexually graphic images on the Defendant's cell phone . . . directly corresponded to descriptive statements he made to [T.D.] on that phone, clearly demonstrating his sexual incentive and motivation . . .

"The facts of this case unquestionably establish the Defendant's prurient drive and predatory campaign of harassment and intimidation against [T.D.]. The Defendant's actions demonstrate his danger to the safety of our citizens. Therefore, the Court finds the Defendant must register pursuant to K.S.A. 22-4902(a)(5)."

While the trial judge could have been more clear that he was contemplating K.S.A. 2011 Supp. 22-4902(c)(15), the language in his order indicates he used that section to support his finding of authority. The trial judge said the facts "demonstrat[ed] [Campbell's] sexual incentive and motivation . . . ." In mirroring the language of K.S.A. 2011 Supp. 22-4902(c)(15), the trial judge indicated that he had made a finding, or at the very least contemplated, that one of Campbell's motivations in committing the crime was his own sexual gratification.

At the motion hearing on the issue of registration, the trial judge stated that his decision on whether Campbell's crime was sexually motivated under K.S.A. 2011 Supp. 22-4902(c)(15) would be an alternative finding. This language requires further consideration from this court. When a trial court provides an alternative basis to support its ruling on an issue and an appellant fails to challenge the validity of each alternative basis on appeal, an appellate court may decline to address the appellant's challenge to the trial court's ruling. *State v. Novotny*, 297 Kan. 1174, 1180, 307 P.3d 1278 (2013).

Here, the trial judge made a finding that he had authority to require Campbell to register under the catch-all provision in K.S.A. 2011 Supp. 22-4902(a)(5). The trial judge also made an alternative finding that the crime was sexually motivated under K.S.A. 2011 Supp. 22-4902(c)(15). Again, at the motion hearing regarding the issue of registration the trial judge stated, "My ruling in regard to whether this was sexually motivated or not, which would be . . . an *alternative finding under a different subsection* has only to do with the Kansas Offender Registration Act and whether Mr. Campbell is required to register based upon that finding." (Emphasis added.)

Furthermore, Campbell's failure to address the fact that the trial judge found his crime to be sexually motivated should be fatal to his appeal. An issue not briefed by the appellant is deemed waived or abandoned. *Williams*, 303 Kan. at 758. As was noted above, a point that is incidentally raised in a brief and not argued therein is also deemed abandoned. *Sprague*, 303 Kan. at 425. Campbell did not present an argument regarding the finding that his crime was sexually motivated. In failing to brief the issue of whether his crime was sexually motivated, Campbell has also failed to address an alternative finding of the trial court.

Finally, it is well accepted that so long as the trial court reaches the correct result, its decision will be upheld even if it relies upon incorrect grounds or assigns erroneous reasons for its decision. *State v. Overman*, 301 Kan. 704, 712, 348 P.3d 516 (2015).

11

Here, even though the trial judge's order stated that he was relying on K.S.A. 2011 Supp. 22-4902(a)(5), he arrived at the correct result in requiring Campbell to register. Campbell's crime of stalking was found to be sexually motivated. A sexually motivated crime not otherwise listed in KORA may result in registration under K.S.A. 2011 Supp. 22-4902(c)(15). Again, according to our Supreme Court, K.S.A. 2011 Supp. 22-4902(c)(15) remains a useful and viable option for unlisted nonsex crimes. *Coman*, 294 Kan. at 94. Campbell committed an unlisted nonsex crime that was found to have been sexually motivated. Therefore, the trial judge's result was correct, even if his means for arriving at the result were imperfect.

Thus, Campbell's arguments are misplaced. The relevant provisions are not ambiguous, so the rule of lenity does not need to be applied. Campbell was required to register because his crime was sexually motivated. It is true that the trial judge should have more clearly communicated that point. Still, the lack of clarity does not take away from the fact that the trial judge had the authority to require Campbell to register under K.S.A. 2011 Supp. 22-4902(c)(15). As a result, we determine that the trial judge properly required Campbell to register under KORA.

*Was There Sufficient Evidence to Convict Campbell of Violating K.S.A. 2011 Supp. 21-5427?*

Campbell also argues on appeal that the evidence presented at trial was insufficient to sustain his conviction because it did not show that Campbell made the calls or possessed a phone on the dates the offensive calls were made. Nevertheless, Campbell's argument ignores key facts that support the trial court's determination of guilt.

The appropriate standard of review when determining whether there was sufficient evidence to support a conviction in a criminal case is whether, after reviewing all evidence in a light most favorable to the prosecution, an appellate court is convinced that

a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). In determining whether there is sufficient evidence to support a conviction, an appellate court generally will not reweigh the evidence or the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). A defendant's conviction will only be reversed in rare cases where the testimony is so incredible that no reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

A verdict may be supported by circumstantial evidence so long as the evidence provides a basis from which the factfinder may reasonably infer the existence of the fact in issue. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). Even so, the evidence does not have to exclude every other reasonable conclusion or inference. *Logsdon*, 304 Kan. at 25. A conviction of even the gravest offense can be based entirely on circumstantial evidence. *Logsdon,* 304 Kan. at 25.

Here, Campbell was found guilty of stalking in violation of K.S.A. 2011 Supp. 21-5427(a)(1)(b), (1)(A). In support of this finding, the trial judge stated:

> "I think this is best described as a circumstantial case, but . . . I'm not gonna compare it to other circumstantial cases . . . . This is a very strong circumstantial case . . . I have confirmed the elements in PIK, the elements of the statute, the elements as charged in the Complaint/Information, and the State has clearly met its burden of proof beyond a reasonable doubt that each and every one of these elements has been met. The weight of the evidence I believe is substantial, albeit circumstantial, in regard to the five or so incidents and the seven or so calls that went along with . . . the video that shows Mr. Campbell. [T.D.] has clearly identified him through the video, in person, [and] by the photo array . . . . The phone was in possession, and quite frankly, between possession and ownership in a case like this, possession trumps ownership, but whether it does or it doesn't, it clearly suffices in terms of adding to the weight of the evidence. There are sexual images on [the phone] which . . . bolster the State's case in terms of the things that were said on the phone to [T.D.] and then the images that were on the phone in

13

defendant's possession match up very well, and then . . . the contacts . . . —the phone calls to [T.D.]'s place of business.

". . . Clearly [T.D.] testified that this frightened her, it scared her. She clearly changed her course of conduct or her mode of operation . . . . That's just a brief recitation of just some of the evidence that supports this."

Campbell asserts that the most the evidence proves is that he was outside T.D.'s place of business on two occasions. Campbell points out that the phone found in his possession during an unrelated arrest did not contain dates that corresponded to the dates the calls were made to T.D. Further, Campbell notes that the two calls on the phone that were made to the salon did not correspond to dates that T.D. received offensive phone calls. Campbell argues that these facts, or missing facts, lead to a conclusion that the evidence was insufficient to support a finding of guilt.

Campbell's arguments are not persuasive in light of the other evidence presented at trial that tended to show that Campbell was the caller. T.D. identified Campbell as the man who knocked on her salon window and pointed to his phone. Thirty minutes after that encounter with Campbell, T.D. received the first offensive phone call. T.D. was able to pick Campbell out of a photo array of suspected callers and identify him at trial. Further, T.D. was able to identify Campbell as the man in a surveillance video taken outside her salon. The surveillance video showed Campbell looking into the salon windows and holding a cell phone to his ear. The surveillance video was taken the same night that T.D. received two phone calls from a private caller. That night, after she received the phone calls, T.D. saw Campbell sitting outside her salon.

Further, the cell phone in Campbell's possession had a contact under the name "Fabulous." The contact listed the correct number for the salon where T.D. worked. The number that was saved was preceded by *67, a designation used to prevent a caller's identity from being revealed to the person he or she calls. All of the offensive calls that

14

T.D. received were from a caller listed as "Private Caller," suggesting the caller used *67. In addition to the contacts, the cell phone contained graphic images of the same types of sex acts that the caller described in his phone calls to T.D.

While Campbell is not wrong in asserting that the facts he argues would bolster the strength of the evidence identifying him as the caller, that does not mean that the existing evidence is so lacking that it cannot support a finding of guilt. The trial judge was correct in asserting that the circumstantial evidence in this case was substantial.

Based on the evidence that was presented, and viewing that evidence in the light most favorable to the prosecution, a factfinder could reasonably infer that Campbell was the person making the calls to T.D. As a result, we determine that sufficient evidence existed to support Campbell's conviction for stalking in violation of K.S.A. 2011 Supp. 21-5427(a)(1), (b)(1)(A).

Affirmed.