NOT DESIGNATED FOR PUBLICATION

No. 119,858

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

PATRICK T. STEWART,
n/k/a: LUCIFER MINDBUBBLE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; TERRY L. PULLMAN, judge. Opinion filed July 19, 2019. Affirmed.

*Carl F.A. Maughan*, of Maughan Law Group LC, of Wichita, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., MALONE and GARDNER, JJ.

PER CURIAM: Lucifer Mindbubble, formerly known as Patrick T. Stewart, appeals the district court's denial of his motion for new trial based on newly discovered evidence. He argues that the district court erred in finding that the newly discovered evidence was not of such materiality that it would likely produce a different result upon retrial. Finding no abuse of discretion, we affirm the district court's decision.

1

FACTUAL AND PROCEDURAL BACKGROUND

While the motion for new trial being appealed to this court was pending in the district court, defendant Patrick T. Stewart legally changed his name to Lucifer Mindbubble. Because Stewart was his legal name during most of the proceedings now before this court, we will refer to him as Stewart here for ease of understanding. In Stewart's direct appeal, this court set out the facts underlying this case:

"While watching the February 6, 2011, Super Bowl at a bar and grill in Derby, T.C. and her 18-year-old-daughter, A.C., met Patrick Stewart and Jennifer Witherell. T.C. believed Stewart and Witherell were from Alaska and that they were staying in town with Witherell's aunt. T.C. was drinking beer and feeling intoxicated. Around midnight as T.C. and A.C. were going home, Stewart and Witherell asked T.C. if they could come over. T.C. agreed and then drove home with A.C., while Stewart and Witherell followed in their own vehicle.

"When everyone got to T.C. and A.C.'s residence, T.C. and Stewart drank whiskey and beer while Witherell drank beer. Though T.C. acknowledged she had cocaine and Lortab in her residence, she does not remember, as Witherell claims, using cocaine with Witherell or giving her a Lortab. Stewart also claimed to have used the cocaine.

"The group eventually needed cigarettes. Stewart asked T.C. if he could take her car to get some. T.C. gave him permission. Before leaving to get the cigarettes, Stewart suggested to A.C. that she go to bed. A.C. went to bed around 3 a.m. while Stewart drove to a [QuikTrip] store. A.C. had not consumed any alcohol or drugs at any point and did not see anybody drink any alcohol at her residence before Stewart went to [QuikTrip].

"While Stewart was gone to [QuikTrip], T.C. and Witherell had begun kissing in the kitchen. When Stewart got back he saw the two women kissing and joined in. At one point, Stewart told Witherell to go and get a rope he had placed just outside the front door of the residence. Witherell complied, despite not recalling seeing a rope when they entered the residence earlier. Indeed, on the front porch, Witherell found the same rope that she and Stewart used to tie her hands during sex.

"When Witherell returned with the rope, Stewart had T.C. pinned to the floor, straddling her stomach as she kicked and screamed. Witherell followed Stewart's order to

2

remove T.C.'s jeans. Stewart repeatedly kicked, punched, and choked T.C., telling her to shut up or he would kill her. Stewart rolled T.C. over and tied her feet and hands together behind her back. Stewart then instructed Witherell to hold a cloth over T.C.'s mouth to keep her quiet. When T.C. begged Witherell not to let anything happen to A.C., Witherell told T.C. to be quiet and let Stewart 'do what he was going to do' or Stewart would go and get A.C. as well. T.C. felt Stewart do something between her legs while he continued choking her with the rope and punching her in the chest, stomach, and face.

"After this, Stewart positioned himself over T.C.'s face in an effort to force her to perform oral sex on him while Witherell held T.C.'s mouth open. The rope was so tight around T.C.'s neck she could scarcely breathe and felt herself floating in and out of consciousness. Stewart then sat on the couch, ordered Witherell to take her clothes off, and pulled T.C. into a position where he could force T.C. to perform oral sex on him. Stewart also handed Witherell her phone and told her to take pictures of him and T.C. The police subsequently recovered five images from Witherell's' phone confirming T.C. performed oral sex on Stewart. T.C. described Stewart's penis as having two piercings and tattoos of flames. Stewart then got up from the couch and went to A.C.'s room.

"A.C. awakened to a naked Stewart holding a knife to her throat. Stewart led A.C. out to the living room and told her to be quiet while continuing to hold the knife to her throat. Once in the living room, A.C. saw T.C. on the floor naked, with her hands tied behind her back, and a rope around her throat. Witherell was also naked and had her hands over T.C.'s mouth. Stewart told A.C. to lie on the floor next to T.C. He then used the same rope binding T.C. to tie around A.C.'s throat and tied both of her hands together in front of her. Stewart then cut all of the clothes from A.C.'s body and asked if she 'liked giving head.' A.C. told him 'no.'

"While still holding the knife, Stewart forcefully put his penis in A.C.'s mouth to have her perform oral sex on him. At one point, Stewart's penis came out of A.C.'s mouth. Stewart put his penis back in her mouth and warned A.C. that if it came out again he would kill her. A.C. also described Stewart's penis as having flame tattoos and at least one piercing. About 5 minutes later, Stewart took his penis back out and asked Witherell whether she wanted the 'young one or the old one.' Witherell chose A.C. and positioned herself over A.C.'s face, forcing A.C. to perform oral sex on her. Stewart then went over to T.C., and A.C. could hear Stewart 'hitting and punching' her.

"This was not a quiet encounter. Around 4 a.m., the next-door neighbor, Sara Cash's daughter, woke her complaining about noise coming from T.C.'s residence. Cash

3

heard banging, loud crashes, wailing, females screaming, and a male voice. Confused and frightened, Cash continued to listen for 50-55 minutes before calling the police. Cash was initially reluctant to intervene because she was divorcing T.C.'s brother but ultimately called the police out of fear for the safety of T.C., A.C., and her own children.

"A short time later, police officers Taylor Moore and Derek Dunn arrived at T.C.'s residence. After hearing what sounded like crying, whimpering, and groaning coming from inside the residence, the officers pounded on the door and announced their presence. At this point, A.C. was being forced to perform oral sex on Witherell. The officers then heard a lot of fast movement coming from the residence and a female voice yell, '[G]et to the door.' Inside, Stewart had run for the back door of the residence while telling Witherell to grab their clothes as she ran after him. Meanwhile, A.C., with her hands still tied, wrapped herself in a blanket and covered T.C. with a sheet. Realizing she was tied to T.C. with the rope, A.C. dragged T.C. closer to the front door and opened it for the officers.

"Upon entering the residence, the officers observed A.C. naked except for the blanket and T.C. lying naked face down on the floor with her wrists and ankles bound together behind her back. Officer Moore then observed Witherell running out the back door. The officers gave chase and subsequently apprehended Witherell in the backyard. The officers found a kitchen knife on the ground within arm's reach of Witherell. When the officers returned to T.C.'s residence, A.C. asked Officer Dunn if they had apprehended the man. The police realized that the man, Stewart, had escaped from T.C.'s residence undetected.

"In the meantime, Stewart had run out the back door in an effort to put distance behind him and T.C.'s residence. He ultimately sought refuge in an unlocked van three or four blocks away. The owner of the van, Trent Peninger, came out of his house moments later and started the van before leaving for work. Once Peninger went back inside his residence to finish getting ready, Stewart stole the van and drove to Witherell's aunt and uncle's house, gathered some clothes, and fled the city. Federal Marshals apprehended Stewart approximately a week later in Springfield, Missouri.

"The State charged Stewart with two counts of aggravated kidnapping in violation of K.S.A. 21-3421, three counts of aggravated criminal sodomy in violation of K.S.A. 2010 Supp. 21-3506(a)(3)(A), and one count of aggravated assault in violation of K.S.A. 21-3410(a). A month later, the State charged Stewart in a separate case for the

4

theft of Peninger's van. Stewart waived his right to a preliminary hearing. The court subsequently consolidated Stewart's two cases.

"By the time of Stewart's trial, Witherell had pled guilty and as part of her plea agreement agreed to testify against Stewart. . . .

"The State presented evidence consistent with our summary. Stewart testified that all of the events that morning were consensual; he did not sodomize T.C. and A.C. against their will; T.C. had agreed to be tied up; A.C. had never been tied up or threatened with a knife; and that he fled the scene because of his outstanding arrest warrants and there was cocaine in the residence." *State v. Stewart*, No. 109,665, 2014 WL 2747586, at *1-3 (Kan. App. 2014) (unpublished opinion), *rev. denied* 302 Kan. 1020 (2015).

On October 22, 2012, a jury convicted Stewart on all counts. Stewart filed a motion for new trial, which the district court addressed at the sentencing hearing on January 10, 2013. In arguing the motion for new trial, Stewart's counsel proffered into evidence a poem dated October 29, 2012, that Witherell had sent to Stewart while both of them were in jail. Stewart's defense counsel argued that the poem was evidence of "some type of vendetta" Witherell held against Stewart that could be used to impeach her credibility, so the poem served as the basis for a new trial. The district court denied Stewart's motion for new trial and sentenced him to 570 months' imprisonment.

In his direct appeal, Stewart argued, among other things, that the district court erred in denying his motion for new trial based on the poem. In rejecting Stewart's claim, this court concluded that "no reasonable probability exists that had the defense admitted the poem into evidence the jury would have reached a different verdict." 2014 WL 2747586, at *16. This court rejected Stewart's other claims of error and affirmed his convictions. 2014 WL 2747586, at *16. On June 30, 2015, the Kansas Supreme Court denied Stewart's petition for review. 302 Kan. 1020 (2015).

On June 9, 2016, Stewart filed a pro se motion for new trial based on newly discovered evidence. He attached two notarized but undated statements to his motion, one from William Struble and another statement from Monty Reichenberger. Struble wrote that he met Witherell while they were both in the Sedgwick County Jail in 2013, and "she would often vent to [him] about her case and" about Stewart. According to Struble, Witherell said that T.C. and A.C. had started some of the sexual contact in February 2011. Struble also stated that Witherell eventually asked him to beat up Stewart "because he wouldn't take the hit for her." Struble concluded: "The comments made by Ms. Witherell during the trial of Patrick Stewart do not match the things she was telling me about the night in question. Jennifer Witherell lied on the stand. Plain and simple."

Reichenberger similarly wrote that he had met Witherell while in the Sedgwick County Jail, and she said that one of the alleged victims in the criminal case had started the sexual contact and that "everyone was consen[s]ual." According to Reichenberger, Witherell "said that after the police were called the 2 women changed what really happened" and "she couldn't understand why they lied." He also asserted that Witherell admitted "she had changed her version of what occurred because they—the State—would give her less time for doing so," and he stated that she "asked [him] a couple of times if [he] would beat [Stewart] up severely because he would not take the fall for her."

Stewart argued that Reichenberger's and Struble's statements were newly discovered evidence that impeached Witherell's testimony and showed that she had "a motive to provide inaccurate testimony—to harm an ex-boyfriend [against] whom she clearly bore a grudge." Stewart argued that "had this evidence of Ms. Witherell's bias been admitted at trial, it is very much [*sic*] likely that the jury would have reached a different verdict, especially as how this new evidence concerning Ms. Witherell points directly to Mr. Stewart's belief that all participants were consenting."

Apparently, nothing happened with Stewart's pro se motion, so in early December 2016, Stewart called the district court to inquire into the status of his motion. On December 7, 2016, the district court issued an order appointing counsel to represent Stewart at a hearing the court set for January 25, 2017.

The hearing on Stewart's motion for new trial was repeatedly continued. On August 15, 2017, Stewart filed a pro se "Motion to Amend Motion for New Trial Filed 9 June 2016," to which he attached a letter he had received from Witherell in July 2017. The letter stated that Witherell forgave him for "destroying [her] self-esteem, for taking [her] for granted, for breaking [her] heart, for dragging [her] through hell, [and] for destroying [her] life." Stewart asserted that the letter "shows that for six and one half years, Ms. Witherell has held [him] responsible for [her] own situation" and that it supported his "claim that Ms. Witherell took the stand at [Stewart's] trial with a vendetta in her heart which caused her to lie on the stand in order to insure a verdict of guilty." He concluded that Witherell committed perjury at his trial because of her animosity and, if not for that perjury, his "trial very easily could have resulted in a different outcome."

On September 28, 2017, Stewart—through counsel—filed a motion for new trial based on newly discovered evidence. As in the pro se motions, he contended that Struble's and Reichenberger's statements, along with Witherell's 2017 letter and the October 2012 poem, were newly discovered evidence that "Witherell is still harboring anger against [Stewart] and . . . places blame on [him]." Stewart attached to the motion Struble's statement, Reichenberger's statement, Witherell's 2017 letter, and Witherell's 2012 poem.

The district court finally held an evidentiary hearing on March 2, 2018. Stewart testified, identifying the 2017 letter and the 2012 poem from Witherell, which the district court admitted into evidence. Stewart also testified that he first met Reichenberger when they lived in the same pod in the Sedgwick County Jail, but they did not discuss Stewart's

case at that time. He testified he only learned about the information from Reichenberger after his transfer to Lansing and, to the best of his knowledge, his attorney did not have this information at the time of trial. Stewart asked Reichenberger to prepare a notarized statement about his communications with Witherell because he "felt that it showed that even more strongly that she had reason to change her testimony at the trial in a vindictive manner." The district court admitted Reichenberger's statement into evidence.

Witherell also testified at the hearing, and she denied knowing Reichenberger. Witherell admitted that she had communicated with male inmates while in the Sedgwick County Jail, but she testified that she did not ask any of them "to approach Mr. Stewart in any way." As for the 2017 letter, Witherell stated that she had written and sent it "[b]ecause [she] felt that it was on [her] heart to forgive and to move forward." When defense counsel asked whether her anger toward Stewart at the time of his trial was "to such an extent that [she] would have lied to get him in more trouble," Witherell replied, "No." Similarly, on cross-examination, Witherell testified that she was angry with Stewart during his trial, but she did not lie about him or his participation in the crimes.

Reichenberger testified that Witherell had started communicating with him in the Sedgwick County Jail. Reichenberger testified that there were "a few letters where she mentioned that she wanted him beat up or put in the infirmary, as she put it, I believe. Because he wouldn't take the fall on the whole case." Reichenberger stated that he showed Witherell's letters to Stewart. He also testified that when he later transferred to Lansing, he saw Stewart walking on the track and asked him "how everything was going." Stewart asked if Reichenberger remembered telling him about the notes from Witherell. Reichenberger said yes, and only then told Stewart about Witherell "saying that it was consensual" and admitting she lied during her testimony at his trial. At Stewart's request, Reichenberger then wrote a statement about his communications with Witherell.

8

As for Struble, defense counsel informed the district court that the last known information on Struble was that he was living in a homeless shelter and he had not been served personally with a subpoena. Over Stewart's objection, the district court ruled that it would not consider Struble's statement since he was unavailable to testify. The State asked the district court to take judicial notice of the court file in the criminal case, and after closing argument, the district court took the matter under advisement.

On March 7, 2018, the district court filed a memorandum decision on the motion for new trial. The next day, the district court issued an amended order, correcting Stewart's name in the caption. The district court noted that Witherell's 2012 poem was addressed in Stewart's direct appeal, and it adopted this court's holding that the poem did not require a new trial. As for the rest of the evidence, the district court gave Stewart "the benefit of the doubt" and found that the evidence he offered for a new trial could not have been produced at trial, even with reasonable diligence.

The district court turned to whether the newly discovered evidence was of sufficient materiality that there was a reasonable probability that a retrial would produce a different result. Ultimately, the district court found:

> "Even if the evidence now offered by Defendant Stewart in the form of the notarized statement and testimony of Mr. Reichenberger was submitted to a jury in a new trial, this Court feels that evidence would not be and is not of such materiality that a reasonable probability exists that it would produce a different result upon retrial.
> "Even if this 'new' evidence could be considered to impeach Witherell, evidence of her fractured relationship with Defendant, her disillusionment with Defendant, her bias and her favorable plea agreement had been presented to the jury during Stewart's trial. The jury had also been given the jury instruction which told them to 'consider with caution the testimony of an accomplice.' It is this Court's opinion that this type of further impeachment of Witherell would not likely produce a different result.
> "The Court found and finds that testimony of both [A.C. and T.C.] to have been credible and very persuasive. Considering the nature of their testimony, this Court finds it

unlikely the further impeachment of Witherell would likely have produced a different result.

"The Court finds the testimony of Ms. Witherell to be consistent and credible.

"The Court finds the testimony of Mr. Reichenberger to have been uncertain, both in the time frame of the alleged statements and the identity of one of the alleged statements. The Court finds his testimony in a new trial would not be of such materiality to find a reasonable probability exists that it would produce a different result upon retrial.

"Furthermore, the Court finds significant corroboration of the victims' accounts—both by physical exhibits and by testimony of other witnesses—all of which have been set out in detail [herein] and involve the testimony and exhibits introduced through the testimony of the two Derby police officers, the Derby police detective, the neighbor and the two SANE/SART nurse examiners.

"After the mutual kissing, consent ended by [T.C.] There was never consent by [A.C.]

"The characterization with which the Court of Appeals began its opinion when it affirmed Defendant Stewart's convictions and sentence was accurate then and remains accurate now:

'A meeting at a bar leads to a horrific attack on a mother and daughter.'

"Defendant's Motion for a New Trial based on Newly Discovered Evidence is DENIED."

Based on its findings, the district court denied Stewart's motion for new trial. Stewart timely filed a notice of appeal.

DID THE DISTRICT COURT ERR IN DENYING STEWART'S MOTION FOR NEW TRIAL?

On appeal, Stewart claims the district court erred in denying his motion for new trial based on newly discovered evidence. He asserts that he offered new evidence to the district court that could not have been discovered at the time of his trial and that the new evidence was of such materiality that it would likely produce a different result upon retrial. Alternatively, Stewart argues that this court should remand his case to the district court for more specific findings.

10

The State asserts that the district court did not abuse its discretion in denying Stewart's motion for new trial. The State first contends that Stewart's evidence was not new because it could have been discovered at the time of his trial. Second, the State argues that even if Stewart's evidence is considered to be newly discovered, the district court correctly found that the evidence was not of such materiality that it would likely produce a different result upon retrial. Finally, the State rejects Stewart's assertion that the district court failed to make sufficient findings to support its decision.

*Sufficiency of the district court's findings*

We will begin by addressing Stewart's argument about the sufficiency of the district court's findings. Stewart argues that we need to remand for more specific findings because the district court's decision failed to address Witherell's 2017 letter and Struble's written statement, in violation of Supreme Court Rule 183(j) (2019 Kan. S. Ct. R. 228).

But as the State points out, Rule 183(j) is plainly inapplicable to rulings other than those made "on collateral challenges under K.S.A. 60-1507." See *State v. Dull*, 298 Kan. 832, 842, 317 P.3d 104 (2014). We will interpret Stewart's argument to mean that the district court failed to make sufficient findings as required by Supreme Court Rule 165 (2019 Kan. S. Ct. R. 221). Rule 165 states: "In a contested matter submitted to the court without a jury . . . the court must state its findings of fact and conclusions of law in compliance with K.S.A. 60-252."

But "litigants and their counsel bear the responsibility for objecting to inadequate findings of fact and conclusions of law in order to give the trial court the opportunity to correct such inadequacies, and, when there is no objection, omissions in findings are not considered on appeal." *State v. Jones*, 306 Kan. 948, 958-59, 398 P.3d 856 (2017). Stewart did not object in the district court to any findings of fact or conclusions of law, so he has not preserved the issue for appeal.

11

Moreover, the district court's finding of facts and conclusions of law are not so inadequate as to preclude appellate review, the test for whether a Rule 165 violation merits remand. See *State v. Wright*, 305 Kan. 1176, 1180, 390 P.3d 899 (2017). The district court's order stated that it "reviewed the Defendant's Motion and its attachments"—which included Witherell's 2017 letter—and the order noted Witherell's testimony at the evidentiary hearing. The lack of detailed discussion of the 2017 letter in the district court's written decision does not impede this court's ability to review the decision. Finally, although Stewart argues to the contrary, we agree that the district court did not err by excluding Struble's written statement as inadmissible hearsay. It was presented for the truth of the matter asserted, Struble was not present at the hearing, and Stewart argued no exceptions to the general prohibition on hearsay evidence. See K.S.A. 2018 Supp. 60-460; *State v. Green*, 254 Kan. 669, 681-82, 867 P.2d 366 (1994) (holding that a district court did not err by excluding inadmissible hearsay evidence at a hearing on a motion for new trial based on newly discovered evidence).

*Standard of review*

The State asserts that the decision whether to grant or deny a motion for new trial based on newly discovered evidence generally rests within the district court's discretion. This conforms to the Kansas Supreme Court's instruction that:

> "An order denying a request for a new trial based on newly discovered evidence is reviewed for abuse of discretion. 'Judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact.' The party asserting the error 'bears the burden of demonstrating an abuse of discretion.' [Citation omitted.]" *State v. Ashley*, 306 Kan. 642, 650, 396 P.3d 92 (2017).

Stewart offers two reasons that this court should abandon this standard of review in favor of an unlimited standard of review. First, he asserts that his newly discovered

evidence "raise[s] a significant possibility of [his] actual innocence." Citing *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995), and *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993), Stewart argues that these cases "suggest[] that the conviction and sentencing of a person who is actually innocent would implicate substantive due process rights which would be violated if the conviction and sentencing stands." Stewart asserts his due process claim is subject to unlimited review.

Stewart mischaracterizes the United States Supreme Court's holdings in *Herrera* and *Schlup*. In both cases, the petitioners sought federal habeas relief and thus implicated the related federal habeas caselaw, which is not applicable to Stewart's case. See *Schlup*, 513 U.S. at 306-13; *Herrera*, 506 U.S. at 393. Contrary to Stewart's assertion, neither *Herrera* nor *Schlup* allude to the proposition that the conviction and sentencing of an innocent person is an independent constitutional violation that demands unlimited review in state court postconviction motions for new trial.

Second, Stewart points out that K.S.A. 2018 Supp. 22-3501 authorizes a district court to "grant a new trial to the defendant if required in the interest of justice." He contends that the district court's finding that "the interest of justice" did not require a new trial constituted statutory interpretation subject to de novo review.

We reject this argument as well. Although a motion for new trial is governed by K.S.A. 2018 Supp. 22-3501, the district court did not have to construe the language of this statute in order to address Stewart's motion. Our Supreme Court has consistently applied the abuse of discretion standard of review to motions brought under K.S.A. 22-3501. See *Ashley*, 306 Kan. at 650; *State v. Parker*, 213 Kan. 229, 233, 516 P.2d 153 (1973). We will do the same. See *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015) (Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position).

*The merits of the district court order*

Stewart claims the district court erred in finding that the newly discovered evidence did not warrant a new trial. The State disagrees.

"In order to establish the right to a new trial based upon newly discovered evidence, a criminal defendant must establish: (1) that the newly proffered evidence could not have been produced at trial with reasonable diligence; and (2) that the newly discovered evidence is of such materiality that it would be likely to produce a different result upon retrial. [Citation omitted.]" *Ashley*, 306 Kan. at 650.

To begin with, the State argues that the district court erred in finding that Stewart's evidence could not have been presented at trial. But we will not review that finding because it was adverse to the State and the State filed no cross-appeal. See *State v. Novotny*, 297 Kan. 1174, 1181, 307 P.3d 1278 (2013) (declining to address finding adverse to the State when the State failed to cross-appeal the ruling).

Thus, the sole issue on the merits is whether the district court abused its discretion by finding that the newly discovered evidence would not likely produce a different result upon retrial. We agree with the district court that Witherell's 2012 poem was addressed in Stewart's direct appeal and was rejected as grounds for a new trial. This leaves Witherell's 2017 letter and Reichenberger's statement and testimony supporting the new trial motion.

As Stewart notes, the district court did not directly address Witherell's 2017 letter in denying his motion for new trial. But the letter is included in the notice of appeal. In the letter, Witherell states that she forgave Stewart and wanted to move forward. There is no information in Witherell's 2017 letter that, if offered into evidence and presented to a jury, would likely produce a different result in Stewart's case upon retrial.

14

Stewart's main evidence supporting his motion for new trial was Reichenberger's statement and testimony that Witherell admitted to him that she lied during her trial testimony about whether T.C. and A.C. consented to sexual activity with Stewart. But Witherell testified at the hearing on Stewart's motion for new trial that she did not lie during her trial testimony, and the district court found her testimony "to be consistent and credible." An appellate court will not reassess the district judge's determination of the credibility of a witness. *Ashley*, 306 Kan. at 650.

Moreover, the Kansas Supreme Court has been clear that evidence that merely tends to impeach the testimony of a witness ordinarily is insufficient to grant a motion for a new trial:

> "[N]ewly discovered evidence that merely tends to impeach or discredit the testimony of a witness is ordinarily not grounds for granting a new trial. . . . Even when the evidence tends to impeach the testimony of a witness, the presence or absence of corroborating evidence is an additional factor to consider in determining whether newly discovered evidence is so material that it is likely to produce a different result upon retrial.
>      "In light of the general rule that newly discovered evidence may not be used solely for impeachment purposes, there would have to be some other compelling reason to grant the motion for new trial. [Citations omitted.]" *Ashley*, 306 Kan. at 650.

Witherell testified at trial as an accomplice to Stewart's crimes, and her testimony merely corroborated the testimony of the victims, T.C. and A.C. Stewart had ample opportunity to challenge the credibility of Witherell's testimony at trial. And the district court instructed the jury at Stewart's trial that it "should consider with caution the testimony of an accomplice."

Finally, it is important that the judge who presided over Stewart's motion for new trial was the judge who presided over his trial, and the judge was familiar with the evidence and the strength of the State's case against Stewart. As the district court noted,

T.C. and A.C. testified in detail at trial about Stewart's actions on February 6, 2011, and their testimony was corroborated by physical exhibits and the testimony of police officers, a neighbor, and two SANE/SART nurse examiners. In denying Stewart's motion for new trial, the district court found the trial "testimony of both [A.C. and T.C.] to have been credible and very persuasive." This finding supports the district court's conclusion that Stewart's new evidence was insufficient to grant a new trial.

After considering the evidence presented by Stewart in support of his motion for new trial, the district court found that the newly discovered evidence was not of such materiality that it would likely produce a different result upon retrial. Stewart bears the burden of showing that the district court abused its discretion in denying his motion. See *Ashley*, 306 Kan. at 650. Applying our standard of review, Stewart fails to persuade us that the district court abused its discretion in denying his motion for new trial.

Affirmed.