No. 101,354

STATE OF KANSAS, *Appellee*, v. PATRICK P. L. NAPUTI, *Appellant*.

(260 P.3d 86)

Opinion filed September 2, 2011.

*Michelle A. Davis,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood,* assistant district attorney, argued the cause, and *Nola Tedesco Foulston,* district attorney, and *Steve Six,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: In two cases consolidated for trial, a jury convicted Patrick Naputi on seven counts of aggravated indecent liberties with a child under age 14. The district court granted Naputi's departure motion and imposed a sentence that included 122 months of incarceration, lifetime electronic monitoring, and lifetime postrelease supervision. Naputi appeals his convictions and sentences, claiming that (1) the prosecutor committed misconduct in closing argument; (2) the district court erred in denying the defense request to modify a jury instruction to reflect the jury's power of nullification; (3) the district court erred in imposing lifetime electronic monitoring; and (4) the imposition of lifetime postrelease supervision is cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Section 9 of the Kansas Constitution Bill of Rights. We affirm the convictions but vacate the portion of the sentence ordering lifetime electronic monitoring in accordance with *State v. Jolly,* 291 Kan. 842, 249 P.3d 421 (2011).

## FACTUAL OVERVIEW

The charges against Naputi alleged that he lewdly fondled or touched six boys, five of whom were in the same fourth grade class where Naputi worked as a paraprofessional. The allegations in that case, 06 CR 2951, originally surfaced when the school principal, David Jennings, contacted law enforcement after being informed by B.S.'s mother that B.S. complained that he had been touched by Naputi on his leg and under his shorts. In response, Jennings sent a letter to the parents of all the children in Naputi's classroom informing them of the accusations and encouraging them to discuss

the issue with their children. As a result, four other classmates, P.S., K.P., L.O., and K.K., reported having been similarly touched by Naputi.

After Naputi was arrested for the alleged classroom incidents, the parents of the sixth victim, B.N., a Naputi family friend, contacted the police. The parents reported that B.N. had said that Naputi touched him during a sleepover at the Naputi family home. Initially, B.N.'s parents believed that B.N. had misconstrued tickling for inappropriate touching. However, once Naputi was arrested, B.N.'s parents formally reported the incident, which led to the aggravated indecent liberties with a child charge in case 07 CR 150. The two cases were consolidated for trial.

At trial, Naputi requested that the district court modify the jury instruction on the State's burden of proof to reflect the jury's power of nullification. The district court denied that request and gave the standard PIK instruction. The jury convicted Naputi on all counts.

Thereafter, Naputi filed a motion for new trial claiming three instances of prosecutorial misconduct during the State's closing argument. Specifically, Naputi complained that the prosecutor (1) misled the jury as to the definition of specific intent; (2) improperly shifted the burden of proof by commenting on the defense's failure to call a therapist as a witness; and (3) made an improper propensity argument in contravention of K.S.A. 60-455 by encouraging the jury to find that B.N.'s allegations corroborated the allegations of the five classmates. Following a hearing, the district court overruled the new trial motion.

At sentencing, Naputi argued for, and was ultimately granted, a downward departure. However, he now complains, and the State agrees, that the district court erred in ordering lifetime electronic monitoring as part of the departure sentence. He also asserts for the first time on appeal that lifetime postrelease supervision constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Section 9 of the Kansas Constitution Bill of Rights.

We have jurisdiction over this direct appeal pursuant to K.S.A. 22-3601(b)(1).

## PROSECUTORIAL MISCONDUCT

Our review of prosecutorial misconduct claims has followed a now-familiar two-step analysis, which we have described as follows:

" ' "First, the court must determine whether the prosecutor's statements were outside the wide latitude for language and manner a prosecutor is allowed when discussing the evidence; second, it must determine whether the comments constitute plain error, that is, whether the statements were so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial." [Citations omitted.]'

"The second step addresses whether the misconduct is so prejudicial that it denies the defendant a fair trial and requires a harmlessness inquiry. [*State v. Brinklow*, 288 Kan. 39, 44, 200 P.3d 1225 (2009)]. Three factors are considered: '(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors.' [Citation omitted.] No individual factor is controlling, and the third factor may never override the first two until both harmlessness tests—K.S.A. 60-261 (prosecutor's statements were inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 22, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (error had little, if any, likelihood of changing the outcome of trial)—have been met. ' " 'If this can be said, then certainly it will also be true "that the misconduct would likely have little weight in the minds of jurors." ' " ' [Citations omitted.]" *State v. Kemble*, 291 Kan. 109, 121-22, 238 P.3d 251 (2010).

Recently, this court's decision in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), endeavored to clarify our caselaw defining and applying harmless error standards, including the two tests described above, *i.e.*, the K.S.A. 60-261 harmlessness test and the *Chapman* federal constitutional harmless error test. *Ward*'s synthesis and standardization of harmless error tests did not purport to modify our prior holding that the *Chapman* harmless error test applies to prosecutorial misconduct claims. Therefore, the third factor of the second step of the prosecutorial misconduct test still may not override the first two factors unless the State has demonstrated "beyond a reasonable doubt that the error complained of . . . did not affect the outcome of the trial in light of the entire record." *Ward*, 292 Kan. 541, Syl. ¶ 6.

### Misstatement of Law

Naputi complains of two separate instances where he believes

that the prosecutor misstated the definition of specific intent—an element of the aggravated indecent liberties offense. K.S.A. 21-3504 requires that the State prove that Naputi engaged in: "Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or satisfy the sexual desires of either the child or the offender, or both." Thus, to convict Naputi, the jury had to find both that his touching of the boys was a lewd fondling or touching and that Naputi's intent in touching the boys was to arouse or satisfy his or each boy's sexual desires.

Naputi suggests that twice during closing arguments the prosecutor misstated the law by combining the two statutory requirements into one. In the first challenged remark, the prosecutor said: "The interpretation of how he touched them, whether there was specific sexual intent involved is not based upon his brain, but based upon the senses of a reasonable person." Naputi argues that this statement eliminated the intent element from the equation by indicating to the jury that his state of mind was irrelevant.

However, reading comments in isolation can frequently be misleading as to the message that the prosecutor was conveying to the jury. Accordingly, we review challenged remarks in their full context. See *State v. Huerta-Alvarez*, 291 Kan. 247, 262, 243 P.3d 326 (2010) (quoting *State v. Murray*, 285 Kan. 503, 511, 174 P.3d 407 [2008]) (" 'prejudicial nature of alleged errors is analyzed in the context of the trial record as a whole' "); *State v. Magallanez*, 290 Kan. 906, 919, 235 P.3d 460 (2010); *State v. Becker*, 290 Kan. 842, 851, 235 P.3d 424 (2010); *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994). The context of the first challenged remark is as follows:

"And then finally that last sentence in that instruction is specifically about sexual intent. All of that evidence may be considered for the purpose of proving his sexual intent with respect to [K.P.], [L.O.], [K.K.] and [B.N.]. How come those four. Because it is [B.S.] and [P.S.] who are actually touched on their genitals. There's no question of sexual intent with respect to those kids because they were actually touched on their sex organs. The others were touched on their legs or in between thighs or right on their pubic bone area. That is why you consider the evidence, all the evidence involved about sexual intent on those other kids who were actually touched on their privates.

*"You will get that even more when you go to the actual definition of lewd fondling. The interpretation of how he touched them, whether there was specific sexual intent involved is not based upon his brain, but based upon the sense of a reasonable person.* Lewd fondling or touching may be defined as a fondling or touching in a manner which tends to undermine the morals of a child which is so clearly offensive as to outrage the moral senses of a reasonable person. That's you. That's you guys. Not him. Which is done with the specific intent to arouse or satisfy the sexual desires of either child, the offender or both." (Emphasis added.)

The context could certainly suggest that the prosecutor was attempting to enlighten the jury about the act of lewd touching or fondling. Notably, the prosecutor included the definition for that type of contact, which refers to a reasonable person. See *State v. Wells*, 223 Kan. 94, 98, 573 P.2d 580 (1977) (defining lewd fondling or touching); PIK Crim. 3d 53. Moreover, the prosecutor followed up by stating the specific intent requirement. Thus, without more, we could find that the context of the first statement keeps it from exceeding the wide latitude afforded a prosecutor during closing arguments.

However, the prosecutor's second remark counsels against a charitable contextual interpretation of her statement of the law. During her rebuttal closing argument, the prosecutor stated:

"Sexual intent, determine it from the place of the touching, and maybe the law on lewd fondling. The interpretation of intent doesn't come from him (pointing). It comes from a reasonable person. And that's you. And I ask that you use your common sense and judgment about determining whether these touches were lewd fondling or not. Find that they were. Find him accountable of all seven counts."

The remark suggests that the jury's inquiry is reduced to the single determination of whether a reasonable person would find that Naputi's touching of the boys fit the definition of lewd fondling. Following the prosecutor's logic, all the State was required to prove was the fact of the lewd contact, allowing the jury to assume the presence of the specific intent element from the act of touching. Moreover, the prosecutor specifically tells the jury not to consider Naputi's subjective intent for touching the boys. Accordingly, we must conclude that the prosecutor's comment was a misstatement of law that effectively combined the lewd touching or fondling element with the requisite specific sexual intent ele-

ment, both of which are required for a conviction of aggravated indecent liberties with a child.

Our finding of misconduct sends us to the second step of determining whether Naputi was denied a fair trial. See *State v. Baker*, 287 Kan. 345, 365, 197 P.3d 421 (2008); *State v. Sappington*, 285 Kan. 176, 186, 169 P.3d 1107 (2007). In *Baker*, we affirmed the defendant's conviction for felony murder and kidnapping despite the prosecutor's misstatement of law regarding the intent element of an aiding and abetting charge. 287 Kan. at 366-68. In making a sports analogy during closing arguments, the prosecutor stated:

" 'My daughter plays on a ball team. She's not a starter, she is what we would call a benchwarmer. She may get in for 40 seconds in a game, she may get in for a minute in the game and that may be it, but she's part and parcel of that team. . . . Doesn't matter that she doesn't play the whole time of the game. Doesn't matter that she didn't make a basket, *it doesn't matter that she didn't get into the game,* she rises and falls as part of the team.' " *Baker*, 287 Kan. at 365.

We found the remark was a misstatement of law because it suggested that mere association was sufficient to support an aiding and abetting conviction. Yet, ultimately we concluded that reversal was unwarranted where the prosecutor repeatedly referenced the correct standard and where the jury received the correct aiding and abetting instruction. 287 Kan. at 368-70.

Our review of the record in the present case supports a similar conclusion. When looking for plain error we must first consider whether the prosecutor's comments were gross and flagrant. Here, the prosecutor twice talked about the act of lewd touching and the required sexual intent as separate elements for the jury's consideration:

"And then finally that last sentence in that instruction is specifically about sexual intent. All of that evidence may be considered for the purpose of proving his sexual intent with respect to [K.P.], [L.O.], [K.K.] and [B.N.]. . . . [Y]ou consider the evidence, all the evidence involved about sexual intent on those other kids who were actually touched on their privates.

". . . Lewd fondling or touching may be defined as a fondling or touching in a manner which tends to undermine the morals of a child which is so clearly offensive as to outrage the moral senses of a reasonable person. . . . Which is done with the specific intent to arouse or satisfy the sexual desires of either child, the offender or both.

"Then what evidence do you go to determine sexual intent. In just like I was saying, the place of the touching, the fact it was under the shorts, and for two of the kids actually on their genitalia.

"And then finally, . . . [l]ewd fondling or touching does not require contact with the sex organ of one or the other. . . . [L]ewd fondling or touching does not require actually [sic] contact with the sex organ itself."

Additionally, the jury was given a proper instruction for aggravated indecent liberties that mirrored the pattern instruction in PIK Crim. 3d 57.06. Where a prosecutor makes both a misstatement of the law and a correct recitation of the applicable law in a closing argument, we have been loathe to characterize the misstatement as being gross and flagrant misconduct. See, *e.g.*, *State v. Adams*, 292 Kan. 60, 68-69, 253 P.3d 5 (2011) (comments not gross or flagrant when "the prosecutor only made a passing reference to the victim and did not dwell on or repeat the point"); *State v. Decker*, 288 Kan. 306, 316, 202 P.3d 669 (2009); *Baker*, 287 Kan. at 368-69; *State v. Miller*, 284 Kan. 682, 719, 163 P.3d 267 (2007) (noting that it is the accumulation of multiple comments which may render them gross and flagrant). Neither does such a situation support a finding of ill will. See, *e.g.*, *State v. McHenry*, 276 Kan. 513, 525, 78 P.3d 403 (2003) (noting that ill will has been found in cases where the prosecutor expressed indifference to a court's rulings, mocked the defendant, or engaged in repeated acts of misconduct and that the lack of such conduct evidences no ill will); *State v. Washington*, 275 Kan. 644, 672, 68 P.3d 134 (2003) (a few comments included in lengthy transcript does not establish gross and flagrant conduct or ill will).

Likewise, reviewing the entire record, we determine that the evidence was such that the misconduct would likely have had little weight in the minds of the jurors. *Adams*, 292 Kan. at 69; *Magallanez*, 290 Kan. at 915; *State v. Henry*, 273 Kan. 608, 619, 44 P.3d 466 (2002). Although the evidence at trial was largely circumstantial, all five classmates testified that they were touched by Naputi in almost identical ways. Those claims were then bolstered by the fact that B.N., who was not a classmate of the other five, testified to experiencing similar contact with Naputi. Finally, Naputi's su-

pervisor testified that she felt Naputi's interactions with the boys were inappropriate.

Under these circumstances we are convinced beyond a reasonable doubt that the prosecutor's singular and isolated misstatement of the law with respect to specific intent made no difference in the outcome at trial.

## Shifting the Burden of Proof

Naputi next argues that the prosecutor improperly shifted the burden of proof when she commented during closing arguments on the defense's failure to call a therapist who had interviewed one of the boys. The prosecutor said:

"It is clear speculation on the part of the defense that these kids have conspired . . . . Where is the evidence that [B.S.] was angry with him. From the outset in his post Miranda interview, his first opportunity to explain himself, he doesn't say anything negative about [B.S.] like he has just said to you today. How did [B.S.] feel. Where is the therapist to talk about this case. The therapist is not here because guess what.

. . . .

". . . The defense has subpoena power just like the State does. If they wanted to get the therapist in here to discount the quality of those feelings, they were welcome to do so and did not."

Naputi contends that *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004), is analogous. There, we found an impermissible attempt to shift the burden of proof to the defense from the prosecutor's comment: " ' "Is there any evidence that the things she told you didn't happen?" ' " 278 Kan. at 92. Again, however, context is the key.

Here, the prosecutor's statement was made in response to the defense counsel's argument focusing on the State's failure to call a witness. In closing, defense counsel stated:

"The State said that they're going to bring in the counselor, this Kraig Moore. And he would tell you about the therapy. . . . [L]adies and gentlemen, you may assume by the State's not putting Mr. Kraig Moore on the stand that you can safely assume that had Kraig Moore taken an oath to testify to the truth . . . that he certainly would not have helped the State in the State's position. . . . [O]therwise he would have been up there. You know that."

In *State v. Verge*, 272 Kan. 501, 512-14, 34 P.3d 449 (2001), defense counsel argued for a favorable inference from the fact that the State did not call certain witnesses. The prosecutor responded by stating: " 'And the point is these witnesses were not unavailable to the defendant, either. . . . Mr. Ney and Mr. Sylvester are two fine attorneys, and if there's people that can help their client, they know how to get them in here.' " 272 Kan. at 513. There, we did not find an impermissible burden-shifting, but rather we determined that the prosecutor was responding in a reasonable manner to defense arguments that faulted the State for failing to call a witness at trial. *Verge* recognized similar holdings in *State v. Baker*, 249 Kan. 431, 446, 819 P.2d 1173 (1991), *State v. Hanks*, 236 Kan. 524, Syl. ¶ 7, 694 P.2d 407 (1985), and *State v. Robinson*, 219 Kan. 218, 221, 547 P.2d 335 (1976). 272 Kan. at 514.

Here, the defense argued that the jury could assume that the therapist would not have helped the State's case because the State did not call him as a witness. The implication, then, is that the witness would have been beneficial to the defense. It is certainly within the wide latitude given to prosecutors to respond to that purported inference by pointing out that if the therapist would have been helpful to the defense, the defense could have subpoenaed him. Such a comment, refuting a purported inference, is not an impermissible shifting of the burden of proof.

*Propensity Inference*

For his final claim of prosecutorial misconduct, Naputi asserts that the following statement made by the prosecutor during closing arguments was an improper propensity inference in violation of K.S.A. 60-455: "Folks, you take [B.N.]'s case and you take the five kids' cases. Mom, I've got something to tell you, and how—how strongly is it that the five kids corroborate [B.N.] and that [B.N.] corroborates the five kids." Naputi argues that the statement implied to the jury that it could find him guilty of aggravated indecent liberties against the five classmates based on the fact that he also improperly touched B.N. and vice versa.

K.S.A. 60-455 deals with the admissibility of evidence of other crimes or civil wrongs. Naputi does not and could not claim that

evidence of the crime perpetrated upon B.N. or evidence of the crimes perpetrated upon the five classmates was inadmissible at his consolidated trial. Accordingly, we are not presented with a K.S.A. 60-455 violation.

However, the prosecutor's statement, in isolation, does run afoul of the multiple counts jury instruction, based on PIK Crim. 3d 68.07, which stated in this case:

"Each crime charged against Patrick P.L. Naputi is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. Patrick P.L. Naputi may be convicted or acquitted on any or all of the offenses charged."

Nevertheless, we must again view the prosecutor's comments in the context of the defense arguments. Naputi contended that the five classmates conspired to falsify their allegations of improper touching. The fact that B.N. made a totally unrelated claim that Naputi engaged in the same type of conduct as the classmates alleged would obviously tend to refute the defense's conspiracy theory. An argument to that effect would not have exceeded the bounds of fair play.

Where the prosecutor went awry in this instance was in saying that the victims corroborated each other, rather than saying the two, separate allegations were inconsistent with a conspiracy. However, we cannot declare that the misuse of the word "corroborate" was gross and flagrant misconduct or the product of ill will. Moreover, the jury was instructed to look at each count separately, uninfluenced by the other charges. We are firmly convinced, beyond a reasonable doubt, that the error did not affect the outcome of this trial.

## JURY INSTRUCTION

Next, Naputi contends that the district court erred when it declined to modify the jury instruction on burden of proof to reflect the jury's power of nullification. Despite his acknowledgement of our 38-year-old holding to the contrary in *State v. McClanahan*, 212 Kan. 208, Syl. ¶¶ 3, 4, 510 P.2d 153 (1973), Naputi argues that the jury's inherent power to ignore the rule of law should be reflected in the jury instructions. Curiously, Naputi also cites to

two additional cases that recognize the power of jury nullification, but reject the idea that a defendant is entitled to have the jury informed of that power. See *Silvers v. State*, 38 Kan. App. 2d 886, 890, 173 P.3d 1167, *rev. denied* 286 Kan. 1180 (2008); *People v. Nichols*, 54 Cal. App. 4th 21, 23-24, 62 Cal. Rptr. 2d 433 (1997).

We need look no further than *McClanahan*, where we disapproved of the "do what you think is fair instruction" that was then set forth in PIK Crim. 51.03. The instruction informed the jury that its members had the power to consider their own conscientious feelings about what was fair under the circumstances and to acquit the defendant if justice required such a result. 212 Kan. at 209. We found this instruction improper because it allowed the jury to ignore legal principles under the guise of a "fair" outcome. 212 Kan. at 214-15. We declared that "it is the proper function and duty of a jury to accept the rules of law given to it in the instructions by the court, apply those rules of law in determining what facts are proven and render a verdict based thereon." 212 Kan. at 217. Accordingly, we concluded that an instruction enabling the power of jury nullification could not survive because it undermined the traditional functions of the court and the jury.

Naputi attempts to distinguish *McClanahan* by suggesting that the severity of the sentence attached to his crimes is not intuitive. His argument is that ordinarily juries have a "sense" of the severity of punishment based on the crime, *e.g.*, murder is punished more harshly than theft. However, he suggests that the sentencing provisions of Jessica's Law confuse that common-sense approach because juries would not necessarily know that the act of touching a child on the thigh could result in a hard 25 life sentence, *i.e.*, a more severe punishment than if the defendant had intentionally killed the child without premeditation. Accordingly, the jury should be allowed to effectively compensate for that discrepancy.

While Naputi's proportionality argument is mildly seductive, it is legally unavailing. It is not the role of the jury to rewrite clearly intended legislation, nor is it the role of the courts to instruct the jury that it may ignore the rule of law, no matter how draconian it might be. The instruction given in this case was a correct statement

of the law. The district court did not err in refusing to make the defendant's proffered modifications.

## LIFETIME ELECTRONIC MONITORING

Both Naputi and the State agree that the portion of his sentence requiring lifetime electronic monitoring should be vacated and remanded with instructions to remove that requirement. We agree. Recently, in *State v. Jolly*, 291 Kan. 842, Syl. ¶ 5, 249 P.3d 421 (2011), we concluded that, based on the language of K.S.A 22-3717(u), the parole board has the sole authority to impose the electronic monitoring condition of parole. *Jolly*, 291 Kan. at 848 (K.S.A 22-3717[u] "plainly states that the parole board shall order electronic monitoring as a condition of parole. [It] does not also provide authority for a sentencing court to order electronic monitoring."). Accordingly, we vacate that portion of Naputi's sentence and remand with instructions to eliminate the electronic monitoring requirement.

## LIFETIME POSTRELEASE SUPERVISION

For his final argument, Naputi contends that the imposition of lifetime postrelease supervision is cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Section 9 of the Kansas Constitution Bill of Rights. The State urges us not to address the issue because the record on appeal is not properly developed. We find that the issue is not properly preserved for appeal.

We have repeatedly stated that the issue of cruel and/or unusual punishment will not be reviewed for the first time on appeal because it requires the district court's findings upon the three-part test established in *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978). *State v. Garza*, 290 Kan. 1021, 1033, 236 P.3d 501 (2010); *State v. Easterling*, 289 Kan. 470, 486, 213 P.3d 418 (2009); *State v. Thomas*, 288 Kan. 157, 160-61, 199 P.3d 1265 (2009); *State v. Ortega-Cadelan*, 287 Kan. 157, 161, 194 P.3d 1195 (2008). Granted, in *State v. Seward*, 289 Kan. 715, 720-21, 217 P.3d 443 (2009) (filed 3 months after the briefs in this case but before oral argument), we faulted both the district court and the defendant

for failing to make an adequate record for review, and we remanded to the district court to apply the *Freeman* factors. 289 Kan. at 722. However, we cautioned that such an outcome was an exceptional situation. 289 Kan. at 721. Central to that decision was the finding that the defendant had adequately raised the issue before the district court.

Here, Naputi made a one-sentence argument in his motion for departure that "the 'one size fits all' sentencing mandate . . . is unconstitutional in that it amounts to punishment that is cruel and unusual." Trial counsel argued the issue with respect to the general sentencing provisions of Jessica's Law and made no mention of lifetime postrelease supervision. Accordingly, we cannot fault the district court for failing to make adequate findings on the constitutionality of lifetime postrelease supervision when that issue was never presented to the sentencing court. Therefore, we decline to consider the issue for the first time on appeal.

Convictions affirmed, sentence vacated in part, and case remanded with directions.

MICHAEL J. MALONE, District Judge, assigned.