NOT DESIGNATED FOR PUBLICATION

No. 119,329

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BORIS TOBAR-CERRATO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS M. SUTHERLAND, judge. Opinion filed August 16, 2019. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., MALONE, J., and STEVEN E. JOHNSON, District Judge, assigned.

PER CURIAM: Boris Tobar-Cerrato appeals his convictions of attempted rape and aggravated sexual battery. He argues that his convictions must be reversed because (1) the State failed to prove one of the alternative means supporting his attempted rape conviction and (2) some of the district court's jury instructions infringed on the jury's power of nullification. We find no error and affirm the district court's judgment.

1

In July 2015, 19-year-old S.B. moved into an apartment complex where lots of "college-aged people" lived. The apartment complex had several communal areas, including a hot tub, a pool, and a "Wi-Fi room." By the end of August 2015, S.B. had met Brittany Taylor, William Ryan Stevens, and Tommy Rhodd at the apartment complex. On September 13, 2015, while in one of the communal areas with Taylor, Stevens, and Rhodd, S.B. met Tobar-Cerrato. The five made plans to meet after work the next day.

The next day at about 6 p.m., S.B. met Rhodd, Stevens, Tobar-Cerrato, Taylor, and Taylor's three-year-old daughter in the Wi-Fi room. They spent some time at the pool and hot tub area, then everyone went to S.B.'s apartment and ate pizza. Tobar-Cerrato retrieved his laptop computer from his apartment, and they all watched a movie.

When the movie ended, Taylor's daughter was getting tired, and Rhodd left. After setting up a movie for Taylor's daughter to watch in the living room, Taylor, S.B., Stevens, and Tobar-Cerrato went into S.B.'s bedroom to hang out. S.B. repeatedly mentioned that she was tired. The adults listened to music and, when Stevens said his back was sore, Taylor gave him a back massage. Tobar-Cerrato asked S.B. to give him a massage as well, but she at first refused. When he asked again, she agreed to do so, and she massaged his shoulders "for maybe five minutes." S.B. and Tobar-Cerrato were not "flirty," and they had no physical contact before the massage.

S.B. later accepted Tobar-Cerrato's offer to give her a back massage. She lay on her stomach on her bed, and Tobar-Cerrato knelt next to her and began massaging her back. Shortly after the massage began, while Taylor and Stevens were still in the room, S.B. fell asleep. She later explained that she was tired from getting up early for work that morning and she has lupus, which causes "extreme . . . fatigue." After S.B. fell asleep, Taylor saw Tobar-Cerrato "rubbing [S.B.'s] lower back, her butt, and . . . underneath her

2

butt." Although Taylor found that "strange" and "inappropriate," she did not think it would progress any further, so she and Stevens left the room and went outside to smoke.

When S.B. woke up, she felt someone on top of her. Her shorts were pulled down to her upper thighs, leaving her genitals and buttocks exposed. Her genital area was wet. Scared and afraid, S.B. turned and saw Tobar-Cerrato on top of her; he was touching her vagina and pushing the head of his penis against her vagina. Taylor and Stevens were no longer in the room. S.B. had not consented to Tobar-Cerrato removing her shorts or to any sexual acts with Tobar-Cerrato. When she turned, Tobar-Cerrato saw that she was awake and "started to get up off [S.B.], and off of the bed." S.B. "jumped up off the bed, and [she] roundhouse punched in him the face."

Tobar-Cerrato ran out of the bedroom, and S.B. "scream[ed] at him to get out of [her] apartment." Taylor and Stevens came into the living room from the balcony. Taylor noticed that Tobar-Cerrato's eye was red and swollen, and Tobar-Cerrato said that S.B. had hit him. S.B. came out of her room, still yelling at Tobar-Cerrato to get out. Tobar-Cerrato grabbed his laptop and he left the apartment, leaving behind his shoes and his phone charger. S.B. told Taylor and Stevens that Tobar-Cerrato had tried to rape her, and she asked them to leave her apartment as well. Although S.B. intended to call the police as soon as Taylor and Stevens left, when she went to her bedroom to get her phone, she felt dizzy and passed out on the floor. When she awoke around 1 a.m., she called 911.

Detective Jay Fleer of the Mission, Kansas Police Department responded to the sexual assault report, and he went to S.B.'s apartment. Other officers were already on the scene and had spoken with S.B.; they told Fleer that S.B. had said she fell asleep watching a movie with other people and woke up to one of the men "trying to have sex with her." S.B. told Fleer about the events of the evening, consistent with the description above. He tried to contact Taylor, but got no response. Fleer interviewed Taylor at her apartment on a later date, and Taylor's memory of the events matched S.B.'s.

3

After speaking with Fleer, S.B. went to the hospital and Nurse Kimberly Foos performed a sexual assault examination. S.B. told Foos that she had fallen asleep while a man was massaging her and, when she woke up, she "found him unclothed on his bottom half, and laying over the top of her trying to inject [*sic*] his penis." S.B. said she was not sure whether he had penetrated her. During the examination, Foos did not observe any injury to S.B., and she collected swabs from S.B. She did note a light mark and areas of redness on S.B.'s inner right thigh.

At 9:19 that morning, S.B. received a text message from Tobar-Cerrato that said, "'I apologize what happened last night is not what you think. I swear to you.'" S.B. did not respond to the text message, but she told Fleer about it. At 5:06 p.m., she received a second text message from Tobar-Cerrato that said, "'Please, I can't get into any more trouble. Please hear me out what I have to say.'" She again informed Fleer and did not respond to the message.

On March 28, 2016, the State charged Tobar-Cerrato with attempted rape and aggravated sexual battery. He pled not guilty to both charges, and the jury trial began on March 20, 2017. S.B. and Taylor testified for the State, relating the events as set forth above. Fleer and Foos also testified for the State.

Forensic scientist Ashley Clark, who performed a DNA analysis, also testified. She found no foreign DNA on the vaginal swabs collected at S.B.'s sexual assault examination. On the labial swabs, however, Clark found Y-STR DNA from a major contributor and a minor contributor. Clark testified that her analysis of the major contributor's profile showed that Tobar-Cerrato "and all the males within his paternal lineage cannot be excluded as a potential DNA donor to this sample." She also explained that "[t]he probability of randomly selecting an individual who cannot be excluded from this Y-STR DNA profile is 1 in 111 for African-American[,] 1 in 59 for Caucasians, and 1 in 95 for Hispanics." On cross-examination, Clark testified that she found no semen on

4

the comforter, S.B.'s shorts, her perianal swabs, or her mons pubis swab all sent to Clark for analysis, so she had not tested them for DNA. Clark also conceded that the major contributor to the sample on the labial swabs "could have been an African-American, a Caucasian, a Hispanic, an Asian, or a Native American."

Tobar-Cerrato declined to testify, and he did not present any evidence. The district court instructed the jury and the parties gave closing arguments. After about 40 minutes of deliberation, the jury found Tobar-Cerrato guilty of attempted rape and aggravated sexual battery. On June 2, 2017, the district court sentenced Tobar-Cerrato to a controlling term of 59 months' imprisonment. Tobar-Cerrato timely appealed.

ALTERNATIVE MEANS CLAIM

Tobar-Cerrato argues that this court must reverse his conviction of attempted rape because the State pursued alternative means of proving attempted rape—that he attempted nonconsensual sexual intercourse while S.B. was (1) unconscious or physically powerless and (2) overcome by force or fear"—but the State "presented no evidence that [he] attempted to rape [S.B.] by using force or fear." The State responds by arguing that the phrase "force or fear" does not present two alternative means of committing rape and that, in any event, there was sufficient evidence of both force and fear. As Tobar-Cerrato points out in his reply brief, he does not argue that the phrase "force or fear" creates alternative means of committing rape, so the State's argument is irrelevant.

Tobar-Cerrato concedes that he did not raise this issue below but, as he argues, our Supreme Court has held that criminal defendants may raise an alternative means argument for the first time on appeal "because it implicates whether there is sufficient evidence to support the conviction. [Citation omitted.]" *State v. Bowen*, 299 Kan. 339, 352, 323 P.3d 853 (2014)."'Issues of statutory interpretation and construction, including

5

issues of whether a statute creates alternative means, raise questions of law reviewable de novo on appeal.' [Citation omitted.]" *State v. Eddy*, 299 Kan. 29, 32, 321 P.3d 12 (2014).

The district court instructed the jury on the charge of attempted rape as follows:

"The defendant is charged with an attempt to commit rape. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. The defendant performed an overt act toward the commission of rape.

2. The defendant did so with the intent to commit rape.

3. The defendant failed to complete commission of rape.

4. This act occurred on or about the 15th day of September, 2015, in Johnson County, Kansas.

"An overt act necessarily must extend beyond mere preparations made by the accused and must sufficiently approach consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. Mere preparation is insufficient to constitute an overt act.

"The elements of the completed crime of rape are as follows:

1. The defendant knowingly engaged in sexual intercourse with S.A.B., who did not consent, under circumstances when she was unconscious or physically powerless and/or she was overcome by force or fear.

2. This act occurred on or about the 15th day of September, 2015, in Johnson County, Kansas.

"Sexual intercourse means any penetration of the female sex organ by a finger, the male sex organ, or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse. "

As to the completed crime of rape, Tobar-Cerrato correctly asserts that sexual intercourse with S.B. while "she was unconscious or physically powerless" and while "she was overcome by force or fear" are alternative means of committing rape. See K.S.A. 2018 Supp. 21-5503(a). As noted above, the State did not respond to this argument. Even so, Tobar-Cerrato's argument fails on its merits because he was not convicted of rape; he was convicted of *attempted* rape.

6

"'Alternative means issues arise when the statute and any instructions that incorporate it list distinct alternatives for a material element of the crime.' 'Alternative means are legislatively determined, distinct, material elements of a crime, as opposed to legislative descriptions of the material elements or of the factual circumstances that would prove the crime.' [Citations omitted.]" *State v. Butler*, 307 Kan. 831, 840-41, 416 P.3d 116 (2018).

Here, the crime of conviction was attempted rape, and K.S.A. 2018 Supp. 21-5301(a) states: "An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." To convict Tobar-Cerrato of attempted rape, the State had to prove only that (1) he performed an overt act toward the commission of rape; (2) he did so with the intent to commit rape; (3) he failed to complete the commission of rape; and (4) the act occurred in Johnson County, Kansas.

The rape statute in effect at the time of Tobar-Cerrato's crime lists distinct alternatives for the material elements of committing rape. See K.S.A. 2015 Supp. 21-5503(a). But the State did not have to prove beyond a reasonable doubt any of the elements of rape to secure a conviction for *attempted* rape. The jury was instructed on the elements of rape so it could determine whether Tobar-Cerrato had committed an overt act toward perpetration of rape, whether he intended to commit rape, and whether he failed to commit rape; not so it could determine whether the State had proven the elements of rape beyond a reasonable doubt. Stated differently, it was unnecessary for the jurors in Tobar-Cerrato's case to agree on which alternative means he may have successfully committed the *completed* crime of rape. Likewise, it does not matter whether there is sufficient evidence in the record in Tobar-Cerrato's case to support each alternative means of successfully committing the *completed* crime of rape.

By definition, an attempt occurs when the crime is not completed, so it is illogical to require the State to prove the elements of the attempted crime to secure a conviction for attempt. See *State v. Hernandez*, 294 Kan. 200, 205-06, 273 P.3d 774 (2012)

(recognizing the inconsistency of convictions for aggravated indecent liberties and attempted aggravated indecent liberties). Tobar-Cerrato's attempted rape conviction does not implicate alternative means analysis based on the statutory alternative means for committing rape. More simply stated, attempted rape is not an alternative means crime. Tobar-Cerrato does not argue that the State failed to prove the required elements of attempted rape. We conclude there was sufficient evidence to support his conviction.

JURY INSTRUCTION CLAIM

Next, Tobar-Cerrato argues that some of the district court's jury instructions infringed on the jury's power of nullification. He challenges the language in two instructions. Jury Instruction No. 1 states, in part: "You must decide the case by applying these instructions to the facts as you find them." Jury Instruction No. 17 states, in part: "Your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions." The State asserts that the district court properly instructed the jury.

> "When analyzing jury instruction issues, we follow a three-step process:
> '(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.' [Citation omitted.]" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

In the first step of the analysis, Tobar-Cerrato concedes that he did not object in the district court to the jury instructions. "'When a party fails to object to or request a jury instruction at trial, K.S.A. 22-3414(3) limits appellate review to a determination of whether the instruction was clearly erroneous.' [Citation omitted.]" *McLinn*, 307 Kan. at 318. When the appellate court applies the clear error standard, it will only reverse the district court if an error occurred and the court is firmly convinced that the jury would

8

have reached a different verdict if the instruction error had not occurred. The party claiming a clear error has the burden to show the necessary prejudice. 307 Kan. at 318.

In the second step of the analysis, this court "'consider[s] whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record.' [Citations omitted.]" 307 Kan. at 318. Tobar-Cerrato argues that the jury instructions infringed on the jury's power of nullification. Jury nullification is

> "'[a] jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness.' Black's Law Dictionary 875 (8th ed. 2004)." *Silvers v. State*, 38 Kan. App. 2d 886, 888, 173 P.3d 1167, *rev. denied* 286 Kan. 1180 (2008).

In *State v. McClanahan*, 212 Kan. 208, Syl. ¶ 3, 510 P.2d 153 (1973), our Supreme Court held:

> "Although it must be conceded that the jurors in a criminal case have the raw physical power to disregard both the rules of law and the evidence in order to acquit a defendant, it is the proper function and duty of a jury to accept the rules of law given to it in the instructions by the court, apply those rules of law in determining what facts are proven and render a verdict based thereon."

Tobar-Cerrato asserts that "informing the jury that it must follow the law as given is an incorrect statement of the law" because a jury has the inherent power to acquit a defendant even when it concludes beyond a reasonable doubt that the defendant is guilty. But as Tobar-Cerrato concedes, this court has consistently rejected the argument that district courts err by giving instructions that do not inform a jury of its power to render a nullification verdict. See, e.g., *State v. Mitchell-Boyles*, No. 114,799, 2017 WL 129949, at *12 (Kan. App. 2017) (unpublished opinion), *rev. denied* 306 Kan. 1327 (2017)

9

(rejecting argument that jury instruction language identical to the language given here improperly dismissed jury's right to render a nullification verdict and holding that the instruction was not legally erroneous); *State v. Moss*, No. 113,034, 2016 WL 3856824, at *16-17 (Kan. App. 2016) (unpublished opinion) (same), *rev. denied* 306 Kan. 1327 (2017); *State v. Boone*, No. 110,836, 2015 WL 3632046, at *3-5 (Kan. App. 2015) (unpublished opinion) (same), *rev. denied* 303 Kan. 1079 (2016).

As this court reasoned in *Moss*, when faced with the same jury instruction language and a nearly identical argument from appellate counsel:

> "In [*McClanahan*], our Supreme Court recognized that the jury had the power to acquit even in the face of overwhelming evidence of guilt. But the *McClanahan* court concluded that it was legally inappropriate to provide a jury with the then available 'do what you think is fair' instruction from PIK Crim. 51.03, because the 'tenor of the instruction militate[d] against our generally accepted law as to the diverse functions of court and jury.' 212 Kan. 208, Syl. ¶¶ 3-4.
>
> "More recently, in *State v. Naputi,* 293 Kan. 55, 65-66, 260 P.3d 86 (2011), our Supreme Court determined that jurors should not be instructed on the power of nullification because '[i]t is not the role of the jury to rewrite clearly intended legislation, nor is it the role of the courts to instruct the jury that it may ignore the rule of law, no matter how draconian it might be.' See also *Silvers v. State,* 38 Kan. App. 2d 886, 888, 173 P.3d 1167, *rev. denied* 286 Kan. 1180 (2008) (Jury nullification is '"[a] jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness."').
>
> "[The] argument that [this] instruction . . . misstates the law is not persuasive. . . . [W]e generally examine the '"jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury."' *State v. Hilt,* 299 Kan. 176, 184-85, 322 P.3d 367 (2014) (quoting *State v. Williams,* 42 Kan. App. 2d 725, Syl. ¶ 1, 216 P.3d 707 [2009], *rev. denied* 290 Kan. 1104 [2010]).

"The instruction . . . 'Your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions' explicitly refers to other instructions. . . . The district court [also] informed the jurors that, even if they had no reasonable doubt as to what the State was required to prove, 'you *should* find the defendant guilty.' (Emphasis added.)

"Read together, the law as given in the instructions was correct . . . .

"[It] simply describes the jurors' legal duty to render a verdict according to the law in the instructions and the evidence as the jurors determine it to be. The instruction, especially in light of the others given, fairly states the law. It did not tell the jury, as Moss argues, that it 'must' convict him, just that it must follow the law given in the instructions." 2016 WL 3856824, at *16-17.

The sound reasoning in *Moss* equally applies here. For the reasons explained in *Moss* and in many other decisions from this court, it is not erroneous for the district court to instruct a jury that "Your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions." Likewise, it is not erroneous for a district court to instruct a jury that "You must decide the case by applying these instructions to the facts as you find them." The jury instructions were legally appropriate.

Although we normally would not need to proceed with the third step of our analysis, we will also find that even if the instructions were not legally appropriate, any error would not require us to reverse Tobar-Cerrato's convictions. Considering the overwhelming evidence of Tobar-Cerrato's guilt presented by the State, we are not firmly convinced that the jury would have reached a different verdict if the instruction error had not occurred. See *McLinn*, 307 Kan. at 318. Thus, any error would have been harmless.

Affirmed.

11