NOT DESIGNATED FOR PUBLICATION

No. 120,754

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSEPH MICHAEL LOPEZ,
*Appellant*.

MEMORANDUM OPINION

Appeal from Jefferson District Court; GARY L. NAFZIGER, judge. Opinion filed December 23, 2020. Affirmed.

*Hope E. Faflick Reynolds*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., HILL and ATCHESON, JJ.

ATCHESON, J.: After hearing an array of direct and circumstantial evidence, a jury sitting in Jefferson County District Court convicted Defendant Joseph Michael Lopez of two counts of aggravated robbery and two counts of criminal restraint for his part in an early morning holdup of a convenience store. On appeal, Lopez contends the prosecutor gave a misleading closing argument to the jury and the district court erred in failing to instruct the jury on how to assess eyewitness identification testimony. He says those problems individually or collectively deprived him of a fair trial. We find no reversible error and affirm the convictions and Lopez' resulting sentences.

1

FACTUAL AND PROCEDURAL HISTORY

To place the issues Lopez raises on appeal in context we discuss the circumstances of the robbery and some of the trial evidence.

• About 4 a.m. on May 22, 2017, the two clerks working at a convenience store in Perry, Kansas, were standing out front when a blue Honda sedan pulled into the parking lot at a high speed. The driver and passenger quickly got out. They wore masks and brandished handguns. They ordered the clerks inside. The clerks described the driver as tall, likely over 6 feet, and the passenger as short—one clerk estimated 5' 4", matching Lopez' height. That morning, the clerks told law enforcement officers they believed both robbers were men based on their voices and mannerisms. The clerks said the passenger wore an army style camouflage jacket. The taller robber ordered one clerk to open a cash register, and the shorter robber ordered the other clerk to open the second register. The robbers took the money from both registers, grabbed several packs of Marlboro Light cigarettes (a detail that figures in the unfolding evidentiary narrative), and drove off in the blue Honda.

• Law enforcement officers found a blue Honda abandoned outside Perry. They removed a $5 bill and a Marlboro Light cigarette butt, among other things, from the car. The owner of the car had reported it stolen. DNA recovered from the cigarette matched a DNA profile for Brittany Knopf. Law enforcement officers tracked her down months later. Suffice it to say, Knopf had continuing involvements in the criminal justice system as a suspect in some investigations and as a defendant in some cases.

In November 2017, Knopf told investigators she helped a man she knew by the street name "Joey Red" steal the Honda sedan in the Kansas City area. She recalled smoking a Marlboro Light cigarette in the car. Joey Red had given her the Marlboro

2

Light; she preferred Marlboro Menthols. Knopf said Joey Red hung around with a man named "Boomer" Finch. She provided investigators with photos of the two that had been posted on social media. After looking at security video from the convenience store, Knopf told investigators the robbers could have been Joey Red and Boomer Finch. Knopf denied any involvement in the holdup.

• Shortly after the robbery, a man living outside Perry was up early and saw a dark colored SUV traveling down the road in front of his house at a high speed. When the man went into town later, he saw a camouflage jacket on the side of the road. After viewing a social media post by police about the convenience store robbery, the man realized the abandoned jacket looked like what one of the robbers wore. Law enforcement officers took custody of the jacket and submitted it for DNA testing.

Forensic examiners were able to extract DNA from the neck of the jacket and identified a major contributor to the DNA sample and one or two minor contributors. The major contributor had a DNA profile consistent with Lopez' DNA profile. The chances of a comparable random profile from another person were astronomical. The minor contributor DNA was insufficient for a comparison with known DNA profiles. With that information, investigators compared a law enforcement identification photograph (a mugshot) of Lopez with the social media posts Knopf provided and determined that Lopez was Joey Red. They quickly discovered that Lopez and Keith Allen Finch shared a house in Tonganoxie. Finch drove a dark colored Escalade and had a known alias of Boomer.

• In January 2018, a detective reinterviewed one of the clerks and played a recorded conversion between Lopez and Finch for her. The clerk identified Lopez' voice as that of the passenger from the blue Honda and Finch's voice as that of the driver. The clerk also told the detective she now recalled having seen the passenger without a mask when he first got out of the car. The detective showed the clerk a photograph of Lopez,

3

and she identified him as the passenger. Several days later, the detective met with the other clerk and had her listen to the tape recording. She, too, identified the voices as those of the robbers, correctly matching Lopez' to the passenger and Finch's to the driver.

• In April 2018, the State charged Lopez with two counts of aggravated robbery, a felony, and two counts of criminal restraint, a misdemeanor. The jury heard the case over three days in early October. Lopez neither testified nor offered other evidence during the trial. The jury convicted him as charged. In December, the district court imposed consecutive guidelines sentences on Lopez for the aggravated robbery convictions to be served concurrent with sentences on the criminal restraint convictions, yielding a controlling term of incarceration of 147 months. Lopez has appealed.

LEGAL ANALYSIS

*Prosecutorial Error in Closing Argument*

For his first issue on appeal, Lopez contends the prosecutor made two substantive errors during closing argument to the jury that deprived him of a fair trial. As we have indicated, we are unpersuaded the prosecutor's argument materially compromised the trial or influenced the verdicts.

Several years ago, the Kansas Supreme Court retooled the analytical model for assessing prosecutorial trial errors, including ostensible misstatements in jury arguments. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). In the *Sherman* analysis, the reviewing court first considers whether an error has occurred and then weighs any prejudice to the defendant resulting from the error. Comments made during closing argument are considered error if they fall outside "the wide latitude" afforded a prosecutor in discussing the evidence and the law. 305 Kan. at 109. That determination replicates the initial step of the former analytical method, while substituting the term

4

"error" for "misconduct," a more pejorative label that at least connotes a deliberate violation of the rules even when there might be only an inadvertent mistake. 305 Kan. at 104-05.

If an appellate court finds the challenged argument to be prosecutorial error, it must then consider prejudice measured by the test set out in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), for a constitutional wrong. The State, as the party benefiting from the error, must demonstrate "'beyond a reasonable doubt'" that the mistake "'did not affect the outcome of the trial'" taking account of the full trial record. 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6). That is, the appellate court must determine if the error deprived the defendant of a fair trial—a constitutional protection rooted both in due process and in the right to trial itself. 305 Kan. at 98-99, 109. The prejudice analysis in *Sherman* replaced a multifactor standard that also considered the prosecutor's bad intent or ill will—breaches of professional conduct the court concluded could be more pointedly addressed in other ways. 305 Kan. at 114-15.

Lopez points to this comment from the prosecutor as one error:

> "Joseph Michael Lopez's DNA was found on the back neck of the jacket. There was no other DNA evidence on the jacket that was sufficient enough [in] quantity or quality to compare to other DNA profiles, *so the idea that someone somehow put on the jacket having Joseph Michael Lopez's DNA on the back of their neck is simply not supported. Lopez was the major and only DNA contributor to the jacket.*" (Emphasis added.)

The first portion of the statement seems to be an accurate summary of the DNA evidence and would be well within a prosecutor's wide latitude in discussing the evidence in closing argument. The italicized comments are closer to the line. The prosecutor seems to be debunking the notion that Lopez' DNA was transferred to the jacket without his having worn it. This, too, is probably fair comment given the evidence showing that one

of the robbers matching Lopez' stature appears to have worn the jacket, one of the clerks identified that robber as Lopez, and he could be tied to the blue Honda used in the holdup. The last statement that Lopez was the *only* contributor to the DNA sample taken from the jacket is incorrect. But the misstatement is, at best, a minor error. The first part of the prosecutor's remarks plainly indicated there were multiple contributors. And the prosecutor may have intended to say simply that Lopez was the only *identified* DNA contributor, consistent with his earlier discussion of the evidence.

The Kansas Supreme Court has recognized that a prosecutor's comments to the jury in closing argument should be examined in the context of the overall point being made. *State v. Naputi*, 293 Kan. 55, 59, 260 P.3d 86 (2011). So a phrase or two extracted from the argument should not be assessed in isolation. Here, we find that admonition particularly apt. The prosecutor's last remark about the DNA sample may have been error in a technical way. But the error was nearly indiscernible in the overall context of the DNA discussion. We comfortably conclude it had no material effect on the outcome of the trial.

Lopez says the prosecutor erred a second time in discussing Knopf's part in the investigation. He told the jury:

> "We also found Brittany Knopf's DNA in that car, and *we also know that Brittany Knopf had nothing to do with the actual armed robbery.*
> "We know that the testimony from [the convenience store clerks] was that both were male—male voices. They conducted themselves consistently with what they observed males to conduct themselves like, and they had no question in their mind . . . that both were males." (Emphasis added.)

The bulk of this part of the prosecutor's argument is clearly proper. Knopf's DNA was found on a cigarette in the blue Honda used in the robbery. And the clerks testified that the two robbers were men. Based on that evidence, it is likely fair comment to say Knopf

6

did not participate in "the actual armed robbery," meaning she was not one of the two robbers. Nothing in the trial evidence suggested Lopez and Finch had a behind-the-scenes accomplice in the crime. Although it's possible they could have, the possibility reflects little more than empty speculation.

We fail to see an error here. But even if the prosecutor's remark were improper, any impropriety would be insubstantial in the context of the trial generally and the closing arguments particularly. Knopf did not directly implicate either Lopez or Finch in the robbery. She tied Lopez to both the blue Honda and to Finch. That was circumstantial evidence at least once removed from the robbery itself. Knopf's suggestion that the robbers depicted in the security video bore a general physical resemblance to Lopez and Finch provided an investigatory lead at the time but added little to the clerks' descriptions of the robbers and the other trial evidence.

*Eyewitness Identification Instruction*

On appeal, Lopez complains that the district court should have instructed the jury on factors for evaluating the reliability of eyewitness identification testimony. Lopez did not request such an instruction during the trial. Although the failure does not bar appellate review, we examine the omission for clear error. See K.S.A. 2019 Supp. 22-3414(3); *State v. Haberlein*, 296 Kan. 195, 203-04, 290 P.3d 640 (2012). Under the clearly erroneous standard, we must be firmly convinced the outcome of the trial would have been different had the omitted jury instruction been given. *State v. Mireles*, 297 Kan. 339, Syl. ¶¶ 6-7, 301 P.3d 677 (2013). As the party claiming error, Lopez bears that burden of persuasion.

The Kansas Supreme Court has recognized eyewitness identification may be fragile in some circumstances. Even the honest, well-intended eyewitness may be mistaken, and various studies suggest the reliability of eyewitness identification may be

reduced in specific situations. See *State v. Mitchell*, 294 Kan. 469, 474-75, 275 P.3d 905 (2012); *State v. Henderson*, 208 N.J. 208, 247, 261-72, 27 A.3d 872 (2011). To aid jurors in evaluating eyewitness identification testimony, the court has recommended the use of an instruction identifying factors that may bear on the reliability of that testimony. The instruction is appropriate when the eyewitness evidence is "a critical part" of the State's case and the circumstances raise "a serious question" about its reliability. *Mitchell*, 294 Kan. 469, Syl. ¶ 2.

The instruction set out in PIK Crim. 4th 51.110 contains five factors and a sixth catch-all that jurors may consider in evaluating eyewitness identification testimony. The *Mitchell* court effectively approved the use of those factors in a jury instruction. See 294 Kan. at 481; *State v. Anderson*, 294 Kan. 450, 458, 276 P.3d 200 (2012) In its entirely, PIK Crim. 4th 51.110 states:

> "The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove (he) (she) has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you should determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:
>
> "1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;
>
> "2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;
>
> "3. Whether the witness had observed the defendant(s) on earlier occasions;
>
> "4. Whether a significant amount of time elapsed between the crime charged and any later identification;
>
> "5. Whether the witness ever failed to identify the defendant(s) or made any inconsistent identification;
>
> "6. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification."

We presume for purposes of deciding this issue that PIK Crim. 4th 51.110 or some equivalent would have been legally and factually appropriate in this case. The clerks' testimony included general descriptions of the robbers, and one of the clerks identified Lopez months later when a detective showed her his mugshot. The clerk then repeated her identification of Lopez during the trial. Although the State had other significant evidence implicating Lopez in the holdup, the eyewitness identification of him would have been a substantial component of the prosecution case. See *State v. Artis*, 314 Conn. 131, 155-56, 101 A.3d 915 (2014) (acknowledging "the powerful effect that eyewitness identification testimony has on juries" but declining to treat its wrongful admission as structural error); *State v. Body*, 366 S.W.3d 625, 628 (Mo. App. 2012) (noting especially "persuasive value" of eyewitness identification).

All of that said, we do not find the failure to give an instruction on the evaluation of eyewitness identification testimony to be clearly erroneous in this case. First, of course, other evidence, including the DNA comparison, tied Lopez to the robbery. Second, the instruction itself consists largely of common-sense considerations that jurors likely would take into account if the lawyers raised them during closing arguments. Given the heavy burden on Lopez, we are unpersuaded the verdict would have been any different had the district court included PIK Crim. 4th 51.110 among the jury instructions.

On appeal, the State argues that *State v. Thurber*, 308 Kan. 140, 198-99, 420 P.3d 389 (2018), precluded giving an eyewitness identification instruction precisely because other evidence pointed toward Lopez' guilt. In other words, according to the State, the instruction would be legally appropriate only when eyewitness testimony alone implicates a defendant in the charged crimes. The State reads too much into the brief discussion in *Thurber*. The court devoted two paragraphs to the instructional issue embedded in a majority opinion covering

9

more than 90 pages. And while the passage might be stretched to suggest an eyewitness identification instruction should not be given if other evidence implicates a defendant, that's hardly explicit. The *Thurber* court actually found the omission of the instruction did not constitute clear error—there, as here, the defendant failed to request it during the trial—because the eyewitness testimony at issue was a peripheral part of the State's case and did not involve the charged crime at all. 308 Kan. at 198-99.

*Cumulative Error*

Lopez argues the cumulative effect of the ostensible errors he has identified deprived him of a fair trial. Appellate courts will weigh the collective impact of trial errors and may grant relief if the overall impact of the deficiencies deprives the defendant of a fair hearing even when the errors considered individually would not necessarily require reversal of a conviction. See *State v. Harris*, 310 Kan. 1026, 1041, 453 P.3d 1172 (2019); *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). An appellate court examines the entire trial record to assess the aggregate effect of multiple trial errors. 301 Kan. at 167-68. The assessment takes account of "how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence." *State v. Miller*, 308 Kan. 1119, 1176, 427 P.3d 907 (2018).

Here, there may have been what we have characterized as a technical error in the prosecutor's closing argument and possibly an error in failing to give a jury instruction on eyewitness identification testimony. We assumed the instructional error. Any actual error would have to be treated as comparatively minor under the circumstances. Given the limited effect of the possible errors, we are unconvinced that they collectively undercut Lopez' right to a fair trial.

10

*Use of Past Convictions in Sentencing*

Lopez contends the district court improperly considered his criminal history when it imposed sentence. He argues that the district court's use of his past convictions in determining an appropriate sentence impairs his constitutional rights because the fact of those convictions was not determined beyond a reasonable doubt by the jury. Lopez relies on the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), to support that proposition. He also acknowledges the Kansas Supreme Court has rejected the argument and has found the State's current sentencing regimen conforms to the Sixth and Fourteenth Amendments to the United States Constitution with respect to the use of a defendant's past convictions in determining a presumptive statutory punishment. *State v. Fischer*, 288 Kan. 470, Syl. ¶ 4, 203 P.3d 1269 (2009); *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). We, therefore, decline Lopez' invitation to rule otherwise, especially given the Kansas Supreme Court's continuing affirmation of *Ivory*. See *State v. Razzaq*, 309 Kan. 544, 552, 439 P.3d 903 (2019); *State v. Pribble*, 304 Kan. 824, 838-39, 375 P.3d 966 (2016); *State v. Hall*, 298 Kan. 978, 991, 319 P.3d 506 (2014).

Affirmed.